# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*In re Commitment of Hooker*, 2012 IL App (2d) 101007

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF UNDRE HOOKER (The People of the State of Illinois, Petitioner-Appellee, v. Undre Hooker, Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-10-1007 |
| Filed | April 11, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The adjudication of respondent as a sexually violent person under the Sexually Violent Persons Commitment Act was affirmed, notwithstanding his contentions that the trial court erred by admitting the testimony of the State's experts as to past conduct of respondent apart from the acts underlying his rape and aggravated criminal sexual abuse convictions, that a proper foundation was not laid for that testimony, and that the trial court failed to weigh the prejudicial effect of that testimony against its probative value, since the testimony at issue was not unduly prejudicial and respondent's multiple arrests and convictions constituted a ground for a diagnosis that he had a personality disorder with antisocial features, and even if there was error, respondent failed to demonstrate that it affected a fundamental right or that the evidence was closely balanced. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 08-MR-1696; the Hon. John T. Phillips, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Paul B. Novak, of Novak Law Office, P.C., of Waukegan, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Leah M. Bendik, Assistant Attorneys General, of counsel), for the People.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.

Presiding Justice Jorgensen and Justice Burke concurred in the judgment and opinion.

# OPINION

¶ 1     Following a jury trial, respondent, Undre Hooker, was adjudicated a sexually violent person under the Sexually Violent Persons Commitment Act (the SVP Act) (725 ILCS 207/1 *et seq.* (West 2008)). On appeal, he argues that the trial court erred by allowing the State's expert witnesses to testify to certain past conduct by him apart from the acts that underlay his convictions of rape and aggravated criminal sexual abuse. Respondent argues that the State did not lay a proper foundation for the experts to mention these facts and that the trial court failed to weigh the prejudicial effect of the testimony against its probative value. For the following reasons, we affirm.

¶ 2                              I. BACKGROUND

¶ 3     To provide a legal context for the background in this case, we note that three criteria must be alleged and established before a person may be committed as a sexually violent person under the SVP Act: (1) the person has been convicted of a sexually violent offense (725 ILCS 207/15(b)(1)(B) (West 2008)); (2) the person suffers from a mental disorder (725 ILCS 207/15(b)(4) (West 2008)); and (3) the person is dangerous to others because his mental disorder creates a substantial probability that he will engage in acts of sexual violence (725 ILCS 207/15(b)(5) (West 2008)).

¶ 4     In December 2008, the State filed a petition seeking to detain respondent pursuant to the SVP Act. The State alleged that respondent was convicted in 2003 of aggravated criminal sexual abuse and that he was evaluated in 2008 by a psychologist, Dr. Ray Quackenbush, who diagnosed him with "Paraphilia, Not Otherwise Specified, Non-consenting Persons." The State alleged that, because of respondent's mental disorder and history of sexual violence, it was substantially probable that he would engage in further acts of sexual violence.

¶ 5     The petition proceeded to trial in February 2010. After jury selection, respondent asked

the court to instruct the jury with Illinois Pattern Jury Instructions, Civil, No. 2.04 (2006) (hereinafter, IPI Civil (2006) No. 2.04) prior to the testimony of each of the two expert witnesses whom the State intended to call. IPI Civil (2006) No. 2.04 reads in its unmodified form:

> "**Limiting Instruction–Expert Testifies to Matters Not Admitted in Evidence**
>
> I am allowing the witness to testify in part to [books] [records] [articles] [statements] that have not been admitted in evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he/she relied on to form his/her opinion[s]. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness."

¶ 6    The trial court replied that it would not give IPI Civil (2006) No. 2.04 at the outset of a witness's testimony but would give the instruction if and when, during the course of the testimony, respondent objected to "the hearsay nature of that." Counsel for respondent then noted "for the record *** that [she] requested this." The court then commented:

> "I understand that you want me to read [IPI Civil (2006) No. 2.04] as it's modified that was given to me here before the State's case even starts or their witness gets on the stand with respect to allowing the witness to testify concerning records, police reports[,] and things like that. If I hear an objection from you at the time to do that, then certainly it would be my plan to give *sua sponte* an instruction like that anyway as to what they can consider it for. It would be as to the basis of the witness' opinion."

¶ 7    The only witnesses at trial were two clinical psychologists who testified for the State: Dr. Quackenbush and Dr. Raymond Wood. Each testified that he interviewed respondent, applied diagnostic criteria, and reached a conclusion as to whether respondent met the SVP Act's definition of a sexually violent person. Quackenbush and Wood both described the documents on which they relied in evaluating respondent. Wood testified:

> "Q. As part of your standard approach to a sexually violent person evaluation do you ever look at any documents?
>
> A. Yes, I do.
>
> Q. How does that fit into your standard procedure?
>
> A. Well, the records review is for me the very first thing. I want to know as much about that person from his or her records as I can before I meet with them for the first time. I have just found in the years that I have been doing work with incarcerated populations it's best to go in with as much knowledge as possible rather than as little knowledge as possible.
>
> Q. So this standard proceed [*sic*] which you have just described, is that how you approached [respondent's] sexually violent person's evaluation?
>
> A. Yes.
>
> Q. So you reviewed documents in this particular case?
>
> A. Yes, I did.
>
> Q. Can you please describe the documents that you looked at?

A. The documents that are available at that point in the process typically are police reports, victim statements, decisions by the court, case records, indictments, judgments and sentences to corrections as well as the Illinois Department of Corrections, or IDOC[,] master file. There may be information if the Department of Children and Family Services was involved. There may be information from them regarding investigation of abuse cases. There may be reports by other mental health professionals regarding the individual that I am examining.

Q. Those documents that you have described, is it reasonable and in the standard practice for professionals like yourself to rely on these types of documents?

A. Yes, it is."

¶ 8    As to his use of documents in evaluating respondent, Quackenbush testified:

"Q. What did you first do as part of your evaluation of [respondent]?

A. The first thing I do is examine the Illinois Department of Corrections master file. The master file is a collection of documents that includes things like police reports, court records, discipline history in prison, previous psychological evaluations, pre-sentence reports. *** Tracking data, health history, medical records. It's a pretty comprehensive set of documents regarding a person and their involvement with the Department of Corrections.

Q. As part of that master file did you review Appellate Court opinions?

A. Yes, I did.

Q. Are the types of documents that you just described reviewing, are they the sort of documents that are reasonably relied on by experts in your field to conduct these types of evaluations?

A. Yes, they are.

Q. Did you rely on those particular documents in doing the evaluation of [respondent]?

A. Yes, I did."

¶ 9    Twice during Wood's testimony, respondent objected when Wood was asked to relate which details in the documents he reviewed were relevant to his evaluation. Neither time did respondent specify the nature or grounds of his objection. Respondent made the first objection when Wood was asked to describe the facts on which one of respondent's rape convictions was predicated. Respondent made the second objection when Wood was asked which details about respondent's 2003 conviction of aggravated criminal sexual abuse were relevant to his evaluation. After making the second objection, counsel for respondent approached the bench and informed the trial court that respondent had "a continuing objection to the time [Wood] is going to be talking about [his] report." After each of these two objections, the trial court admonished the jury with IPI Civil (2006) No. 2.04. On two additional occasions during the testimony, once between Wood's direct and cross-examinations, and again during a break in Quackenbush's direct examination, the trial court, unprompted by any objection by respondent, *sua sponte* admonished the jury with IPI Civil (2006) No. 2.04. The following is representative of the several admonitions that the court

gave during the course of the testimony:

"Ladies and gentlemen, I am going to allow the witness to testify as to what he considered, and the information that he considered is going to be allowed by me for a limited purpose, and it's permitted for you to weigh and evaluate the opinion that is going to be given by this witness. The material itself that's referred to is not evidence in this case, and that material can't be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, to give the opinions that are going to be made by this witness."

¶ 10    As part of its instructions to the jury, the court provided this modified form of IPI Civil (2006) No. 2.04:

"I have allowed the witnesses to testify in part to records including but not limited to police reports, Department of Corrections records, Department of Human Services records, psychological evaluations, psychological testing, psychological articles and statements other than those made by the Respondent to the witnesses that have not been admitted in evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he relied on to form his opinion. The material being referenced to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give to the opinions testified to by this witness."

¶ 11    The evidence at trial fell into two major subjects: (1) respondent's past conduct; and (2) his mental health.

¶ 12                              A. Respondent's Past Conduct

¶ 13    The parties presented the following stipulation with regard to respondent's prior convictions:

"The respondent, Undre Hooker, has been convicted of the sexually-violent offense of aggravated criminal sexual abuse; Lake County Case No. 03CF2765; and was sentenced to five years in the [DOC].

The respondent, Undre Hooker, has been convicted of the sexually-violent offense of rape; Will County Case Nos. W79C464 and W79C189; and was sentenced to 30 years in the [DOC]."

¶ 14    Wood and Quackenbush supplied details of the crimes, all of which involved different victims. The two rape cases led to convictions in 1981 and 1982, and the victims were, respectively, L.B. and S.H. Wood testified that he learned the details of the rapes from respondent's "rap sheets" and from the decision of this court in *People v. Hooker*, 96 Ill. App. 3d 127 (1981), in which respondent appealed from his conviction of the rape of L.B. The testimony at trial showed that respondent and his half-brother forced 16-year-old L.B. into a van, threatened to kill her, and then raped her. *Id.* at 129. The State introduced evidence of respondent's subsequent rape of S.H. as other-crimes evidence. This court found no error in the introduction of the rape of S.H., as the crimes were "sufficiently similar." *Id.* at 135. Our opinion did not relate the details of the rape of S.H. except to note that it also

involved abduction into a van. *Id.* Nor did our decision note the age of S.H. at the time of the attack.

¶ 15    Wood testified that both rapes were done at gunpoint, but our opinion in *Hooker* did not indicate whether a gun was involved in the rape of S.H.

¶ 16    Our opinion in *Hooker* noted that respondent received 30 years in prison for the rape of L.B. According to Wood, court records showed that respondent received two concurrent prison terms of 30 years for the rapes. (This was consistent with the parties' stipulation as to the prison sentence respondent received for the rapes.)

¶ 17    The witnesses also testified to respondent's 2003 conviction of aggravated criminal sexual abuse. Quackenbush testified that he learned the details of the abuse from a DCFS report, but Wood did not identify the source for the details he learned. According to Wood, documents showed that respondent's niece, K., reported that, for several months, respondent sexually abused her by touching her chest, vagina, and buttocks, and by having vaginal intercourse with her. The abuse began when K. was 10 years old. Wood testified that another girl, B., who was living in the same household as K., reported that respondent tried to "feel on her" but was unsuccessful. B. reported that respondent was "always *** trying to get into the bathroom when she was there." According to Wood, B. was six years old when the attempted abuse occurred.

¶ 18    Quackenbush testified to the following as taken from DCFS documents:

"In 2003 a report was made to DCFS that [respondent] was sexually abusing two young girls. The abuse would have taken place with each girl when she was about 10 years old. He placed his hands down their skirts. In the instance of one girl he had sexual intercourse with her several times over a period of months. He threatened the girls that if they told their mother, he would tell her that they had been messing around with boys and get them in trouble. He also told them that they had to play football with him and if they lost, then he could have sex with them. At the time of this he was actually residing in the home and was in a position of being an uncle to them."

¶ 19    Quackenbush noted that a medical examination of K., the girl who reported sexual intercourse with respondent, showed that intercourse "could have taken place." Asked if DCFS had made a "finding" in the case, Quackenbush responded that "DCFS found that abuse was indicated."

¶ 20    According to the witnesses, respondent pled guilty to aggravated criminal sexual abuse in connection with the foregoing allegations and was sentenced to probation. Though there were two alleged victims, Wood testified that the sexual abuse conviction resulted only from the abuse of K. (Quackenbush did not indicate which of the allegations he related were the basis of the conviction.)

¶ 21    The witnesses testified that respondent later violated several conditions of the probation imposed for the sexual abuse conviction. First, he did not maintain contact with his probation officer, provide a DNA sample, maintain employment, or complete sex offender treatment. Second, he was arrested for another offense. Specifically, during the course of a traffic stop, the police found a .25-caliber semiautomatic handgun in respondent's car. As a result of the probation violations, respondent was sentenced to five years in prison. (This, presumably,

was the five-year term referred to in the parties' stipulation.)

¶ 22    Quackenbush testified that respondent's conviction of aggravated criminal sexual abuse was illuminating because it indicated his "choice of victims" and gave "information about what he does in offending and what his pattern of behavior is." Quackenbush found it relevant that respondent abused his position of trust as K.'s uncle by sexually molesting her rather than serving as her protector. The offense itself, as well as respondent's conduct while on probation, was useful to Quackenbush in determining whether "this [is] somebody who does what he is required to do."

¶ 23    The witnesses noted that, in their interviews with him, respondent denied having committed any of the sex crimes and claimed that the accusations were brought for spite by the victims or their mothers.

¶ 24    The witnesses testified that, in addition to the convictions of rape and sexual abuse, respondent had convictions of burglary and escape. The latter conviction was based on respondent's escape from the Will County jail during the pendency of his rape charges. Also, in 1994, one month after he was released from prison, respondent was involved in an argument with a female victim who was the mother of several of his children and who had periodically cohabitated with him. The argument escalated, and respondent struck and stabbed the victim. He stole her car and was later apprehended in Arkansas. He was charged with aggravated battery and possession of a stolen vehicle. He was convicted of aggravated battery and sentenced to four years in prison. Respondent also had a conviction of failing to keep his sex offender registration current. According to Wood, the registration offense fits "a general pattern" in respondent's behavior but has "no more specific importance beyond that." According to Quackenbush, however, such a registration violation is "a sexually-violent offense" that is "one of the strongest predictors" of recidivism among sex offenders.

¶ 25    Wood noted that respondent's "rap sheets" showed 13 total convictions. Wood observed that respondent's presentence report appeared to show eight additional convictions, but as many as four of these might have overlapped with convictions listed on the rap sheets.

¶ 26    The witnesses also considered conduct by respondent that did not result in a conviction. Quackenbush testified that, during their interview, respondent claimed that, at age 15, "he had raped a girl and had been arrested for it." According to Wood, respondent "reportedly told another examiner that he had committed a rape when he was 15 years old." When Wood interviewed respondent, however, he denied committing the rape or making the statement to the other examiner.

¶ 27    According to both witnesses, police reports showed that, on two separate occasions, respondent's niece (different than K.) reported to police that respondent threatened to kill her and then choked her until she passed out. Regarding the first report, the police attempted follow-up contact with the niece but were unsuccessful and later dropped the investigation. Regarding the second report, when the police did contact the niece she stated that she did not wish to press charges.

¶ 28    Regarding respondent's arrest record, Quackenbush noted that respondent's adult record shows 23 or 24 arrests. The arrests were for a "mixture of things," including traffic offenses, battery, and domestic violence. The arrests for domestic violence were multiple. According

to Wood, respondent's rap sheets show 27 total arrests.

¶ 29    The witnesses also testified to conduct respondent exhibited while in prison. Wood noted two significant instances in which respondent was subjected to discipline. First, respondent was found to possess 2½ gallons of "hooch," which is an alcoholic substance made of fruit juice, sugar, and bread. Wood found this incident significant because respondent had denied to Wood a history of substance abuse. Second, respondent sexually harassed and threatened a female prison employee who was working in the prison tailor shop. The worker reported that, whenever she looked at respondent, he rubbed his groin. When she ordered him to stop, he told her that she did not see what she thought she saw. He also commented that, since they worked together, they had to get along. The worker reported respondent to her supervisor. Later, respondent told her to enjoy the upcoming Thanksgiving holiday because it could be her last. Respondent also recited to the worker the correct address of her family and threatened to kill her daughter if the worker took action against him. As a consequence of this conduct, respondent was given solitary confinement.

¶ 30    Quackenbush also found the harassment incident material to his evaluation, but he did not mention the "hooch" possession.


¶ 31                            B. Respondent's Mental Health

¶ 32    Wood and Quackenbush each evaluated respondent according to the criteria of the Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV), which provides criteria for diagnosing mental disorders. Wood diagnosed respondent with three mental disorders: (1) paraphilia, not otherwise specified, sexually attracted to nonconsenting females, nonexclusive type; (2) pedophilia, sexually attracted to females, nonexclusive type; and (3) personality disorder, not otherwise specified, antisocial features.

¶ 33    Wood explained that paraphilia "is a sexual disorder that is marked by current intense sexual fantasies, urges, behaviors or thoughts that involve deviate sexual objects." For respondent, the objects were nonconsenting females. Wood noted that a diagnosis of paraphilia requires that the feelings, urges, or fantasies have existed for at least six months and that the person has acted on them. By "nonexclusive," Wood meant that respondent is not sexually aroused exclusively by nonconsenting females. Wood explained how he reached the diagnosis of paraphilia:

    "Relative to the time criteria based on [respondent's] records, his first convictions occurred in 1980. The first offenses occurred in 1979. The 2003 offense occurred between 2002 and 2003. And so that's at least a six-month period of time. He has been convicted three times, so there is a basis for believing that he has in fact acted on it. In the first two rape cases the victims reported that they were raped at gunpoint, so it's nonconsensual. They are both females. But–and the final qualifier, nonexclusive type, indicates that there is reason to believe that [respondent] is not sexually aroused only by thoughts or fantasies or by rape."

¶ 34    Wood explained that pedophilia refers to "current intense sexual thoughts, fantasies or urges regarding children generally under the age of 13, but not necessarily." As with paraphilia, the thoughts or urges or fantasies have to have existed for at least six months, and

the subject has to be at least 16 years old and more than 5 years older than the victim whom the subject has abused. Wood explained that his pedophilia diagnosis was based on the fact that respondent abused K. for more than 6 months and that he was over 16 years old and also more than 5 years older than K.

¶ 35    Wood testified that a personality disorder exists when one's behavior "becomes so singular that it moves outside of what's considered normal within our culture." Wood explained the basis for his diagnosing respondent with a personality disorder:

"I looked at [respondent's] long history of engaging in behaviors that placed him at risk for and ultimately resulted in his being arrested, the fact that he has used people without[,] in my opinion[,] any regard for their rights, their concerns, their welfare. He has manipulated individuals. He has used aliases. He has engaged in a number of criminal behaviors and that that [*sic*] pattern of so engaging in those behaviors has existed for a very long time."

¶ 36    Wood testified that, in his opinion, these three diagnoses qualify as mental disorders under the SVP Act. Wood further opined that these disorders negatively affect respondent's emotional and volitional capacity and predispose him to further acts of sexual violence. Respondent's multiple incarcerations for sexual violence confirm that it is "very hard" for him to control himself. Without treatment, Wood maintained, there is "little likelihood" that the disorders will pass.

¶ 37    Wood testified that he also performed an actuarial assessment of the risk that respondent will engage in further sexual violence. Wood used two actuarial instruments: the Static 99 and the Minnesota Sex Offender Screening Tool Revised (MNSOST-R). Both instruments indicated that respondent was at high risk to reoffend. Wood noted, however, that diagnostic instruments do not consider all information relevant to risk. Rather, Wood customarily considers various other factors to further refine the risk measurement yielded by the actuarial tests. In the present case, Wood saw several factors that raised respondent's risk of recidivism as assessed by the instruments. First, respondent was diagnosed with a personality disorder, which has "been found to be associated with recidivism." Wood explained:

"[A]gain, personality is our characteristic way of thinking about or going about doing things in relation to other people. So if at my core this is how I relate to other people, I am likely going to continue to relate to other people in that fashion."

¶ 38    Wood also cited respondent's "[l]ow motivation for treatment" and "global problems with intimacy." The final aggravating factors were respondent's "impulsiveness" and "recklessness."

¶ 39    Wood identified three factors that can mitigate a subject's assessed risk: (1) age; (2) medical condition; and (3) treatment. In respondent's situation, none of these mitigated the assessed risk. First, respondent's age, 57, left him at still a high risk to reoffend. Second, respondent did not suffer from any medical condition that made it difficult or impossible for him to perform sex acts. Third, though respondent attended three sessions of a sex offender treatment program while incarcerated, there was "no evidence that he participated in that treatment or made any benefit or progress within it." Wood opined that, to a reasonable degree of psychological certainty, it is substantially probable that respondent will engage in

further acts of sexual violence. Wood concluded that respondent is a sexually violent person as defined by the SVP Act.

¶ 40    On cross-examination, Wood clarified that the diagnoses of paraphilia and pedophilia were based entirely on respondent's actions and that Wood saw no evidence that respondent has "urges or fantasies." When Wood asked respondent about his sexual fantasies, he replied that "he did not have any and he though [*sic*] that such fantasies towards women would be disrespectful."

¶ 41    Quackenbush testified that he diagnosed respondent with two disorders from the DSM-IV: (1) paraphilia, not otherwise specified, nonconsenting persons; and (2) personality disorder, not otherwise specified, antisocial features. Quackenbush used substantially the same diagnostic criteria for paraphilia as did Wood. For instance, both experts applied the six-month threshold. While Wood asserted that the subject must have "acted on" his urges, fantasies, or thoughts, Quackenbush stated that the subject must either have acted on the urges, fantasies, or thoughts, or have suffered "marked impairment" in his life because of them. Quackenbush noted that respondent easily met the 6-month threshold because his sexual offenses stretch over a 30-year period. Respondent, moreover, has acted on his urges, as he "has spent the majority of his adult life in prison as a result of his sexual behavior with nonconsenting persons." Quackenbush based the diagnosis of personality disorder with antisocial features on respondent's "24 or 25 arrests," his "numerous convictions," and the fact that "nothing [respondent] has said or done indicates any regard for the safety of his victims or himself." Quackenbush asserted that respondent's disorders affect his emotional and volitional capacity and predispose him to commit acts of sexual violence. Respondent is "very dangerous" because he does not control his behavior.

¶ 42    Like Wood, Quackenbush also performed actuarial assessments using the Static-99 and the MNSOST-R. Respondent scored in the "moderate-to-high risk range" on the Static-99. While the Static-99 is a "useful tool," it must be employed with caution, for two reasons. First, it considers the risk only 15 years into the future. Second, it measures the probability of commission, arrest, and conviction, not just the probability of commission. The Static-99 "dramatically underestimates the true rate of offenses" because "most sex offenses are never reported; and of those that are reported, most don't result in conviction." The MNSOST-R is even more limited because it considers the likelihood of commission, arrest, and conviction within six years. Even so, respondent scored in the "high range" on the test, and in fact had the highest score Quackenbush had ever seen.

¶ 43    Because neither actuarial test "answer[ed] all *** the questions," Quackenbush used another resource called the Hare Psychopathy Checklist. This test measures two dimensions of pychopathy–"remorseless use of *** other people" and "propensity to lead a criminal lifestyle"–and provides an overall score. Respondent scored in the 98th percentile on the Hare Checklist.

¶ 44    Quackenbush, however, did not want to rely on the tests alone, so he considered "dynamic risk factors and other elements" that were not factored into the tests. The first was respondent's failure to maintain his sex offender registration. A registration failure, Quackenbush explained, is among the strongest predictors of recidivism among sex

offenders. Quackenbush also considered respondent's "general criminal tendencies," including his arrest and conviction record, which show "a criminal lifestyle." Quackenbush further considered whether respondent has "general self-regulation deficits," that is, whether he is "able to control [himself] and lead [his] life in a way that is successful," and whether he can "meet [his] obligations" and "do the things [he] needs to do." Quackenbush determined that respondent "has been unable to follow the law" and has also been disciplined while in prison. This general self-control deficit indicates a higher risk to reoffend.

¶ 45    Like Wood, Quackenbush also considered potential mitigating factors, but none applied to respondent. For instance, respondent did not suffer from a medical condition that impaired his ability to perform sex acts, but rather he was in "very good health." Also, respondent never completed sex offender treatment. He claimed to have completed treatment while in Stateville prison, but Quackenbush confirmed that Stateville never had such a program. As a condition of his probation for the 2003 conviction of aggravated criminal sexual abuse, respondent was required to complete sex offender treatment. He twice began treatment but did not complete it. Quackenbush cited research that an offender who withdraws from treatment is at a higher risk to reoffend than one who has never started treatment.

¶ 46    Quackenbush opined that, to a reasonable degree of psychological certainty, it is substantially probable that respondent will commit another sexually violent offense. He agreed with Wood that respondent meets the SVP Act's criteria for a sexually violent person.

¶ 47    The jury returned a verdict finding that respondent is a sexually violent person. Respondent later filed a posttrial motion alleging, in part, that the trial court erred by "fail[ing] to read [IPI Civil (2006) No. 2.04] prior to either one of [the] doctor[s'] testimony." The trial court denied the motion, and the case proceeded to a dispositional hearing. The court remanded respondent to the custody of the Department of Human Services. He then filed this timely appeal.

¶ 48                                    II. ANALYSIS

¶ 49    As noted, the State must allege and establish three elements in seeking to commit a person as a sexually violent person under the SVP Act: (1) the person has been convicted of a sexually violent offense (725 ILCS 207/15(b)(1)(B) (West 2008)), (2) the person suffers from a mental disorder (725 ILCS 207/15(b)(4) (West 2008)), and (3) the person is dangerous to others because his mental disorder creates a substantial probability that he will engage in acts of sexual violence (725 ILCS 207/15(b)(5) (West 2008)). Although a proceeding under the SVP Act is civil (725 ILCS 207/20 (West 2008)), the State must prove the foregoing elements beyond a reasonable doubt (725 ILCS 207/35(d)(1) (West 2008)).

¶ 50    Respondent argues that a significant portion of the expert witnesses' testimony at trial was inadmissible. First, respondent argues that the State failed to lay a proper foundation for its expert witnesses to testify to various past conduct by respondent as drawn from various documents not admitted in evidence. Second, respondent contends that, the foundation issue aside, the trial court failed to balance the probative value and prejudicial effect of the evidence.

¶ 51    As respondent notes, Illinois courts have "long held that prohibitions against the

-11-

admission of hearsay do not apply when an expert testifies to underlying facts and data, not admitted into evidence, for the purpose of explaining the basis of his opinion." *People v. Lovejoy*, 235 Ill. 2d 97, 142 (2009). This rule had its genesis in *Wilson v. Clark*, 84 Ill. 2d 186 (1981), and we refer to it hereinafter as the *Wilson* rule. "[A]n expert may give opinion testimony which relies upon facts and data not in evidence, as long as the underlying information is of the type reasonably relied upon by experts in the particular field." *Lovejoy*, 235 Ill. 2d at 142. The underlying information "must be sufficiently trustworthy to make the reliance reasonable." *Bass v. Cincinnati Inc.*, 281 Ill. App. 3d 1019, 1024 (1996).[1] Provided the foundational requisites are met, an expert is permitted "not only to consider the reports commonly relied upon by experts in their particular field, but also to testify to the contents of the underlying records." *Lovejoy*, 235 Ill. 2d at 143. Respondent argues that, with respect to certain data relied on by the State's experts, the State failed to establish that the data is reasonably relied upon by experts in their particular field. Respondent identifies specifically this information: (1) records of his arrests and of allegations that apparently did not result in an arrest; (2) DFCS records showing an indicated finding that he abused his niece K. and another girl; (3) prison records showing that he possessed "hooch"; and (4) his alleged use of "aliases," to which Wood alluded, but for which he cited no source.

¶ 52    The State asserts that respondent forfeited this claim by failing to raise it below. Respondent has not filed a reply brief but, anticipating a forfeiture argument, submits in his opening brief that he "preserved said issue for appeal by making an objection during the proceedings as well as in a post trial motion." As we read the record, however, the issue respondent preserved for appeal is not the issue he presents here. The issue he preserved below is whether the trial court should have admonished the jury with IPI Civil (2006) No. 2.04 prior to the testimony of each of the State's expert witnesses. The issue he presents on review is whether the trial court erred in allowing the experts to testify to certain data on which they relied in forming their opinions.

¶ 53    To demonstrate this distinction, and its importance, we note first that respondent made a pretrial request that the trial court instruct the jury with IPI Civil (2006) No. 2.04. The court refused to give IPI Civil (2006) No. 2.04 anticipatorily, but said that it would admonish the jury with the instruction if and when respondent objected to the hearsay nature of the experts' testimony. Respondent objected twice during Wood's testimony, but he never specified the grounds for the objections. Unless they are obvious from the record, the grounds for an objection must be specifically stated in order to preserve an issue for appeal. *Hall v. National Freight, Inc.*, 264 Ill. App. 3d 412, 425 (1994). The most that can be gathered from the context of these unspecific objections is that respondent was objecting to the hearsay nature of the experts' testimony in describing materials they relied on in formulating their

---

[1] This standard is codified in the new Illinois Rules of Evidence, effective January 1, 2011. See Ill. R. Evid. 703 (eff. Jan. 1, 2011) ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.").

evaluations and that respondent aimed to ensure, via IPI Civil (2006) No. 2.04, that the jury did not consider the materials as substantive evidence. The same concern, it appears, was voiced by respondent in his posttrial motion alleging that the trial court erred by "fail[ing] to read [IPI Civil (2006) No. 2.04] prior to either one of [the] doctor[s'] testimony."

¶ 54    On appeal, however, respondent does not challenge the trial court's refusal to give IPI Civil (2006) No. 2.04 at any particular time. His argument is not that the jury was somehow insufficiently admonished that certain data cited by the State's experts as bases for their evaluations could be considered only for the limited purpose of judging the strength of those evaluations. Rather, his argument is that certain data cited by the experts did not meet even the *Wilson* standard and should not have been considered by the jury for *any* purpose. Specifically, he contends that the State did not establish either that "the information relied on by both Dr. Wood and Dr. Quackenbush [is] *** relied upon by other experts in the field," or that "the information *** was sufficiently trustworthy to make such reliance reasonable." Yet, in requesting IPI Civil (2006) No. 2.04, without any further challenge to the experts' testimony, respondent tacitly approved the jury's consideration of the data for the limited purpose allowed by the instruction. Thus, even if we considered the intention of respondent's unspecific objections obvious from their context, we would still have to conclude that respondent forfeited the particular claim raised here. An objection made on specific grounds forfeits all other grounds that the party may have cited. *People v. Eyler*, 133 Ill. 2d 173, 219 (1989); *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 548 (1984).

¶ 55    Respondent contends, however, that even if he did not bring this particular argument below, the plain-error doctrine saves him from the forfeiture. We have applied the plain-error doctrine in cases under the SVP Act. See, *e.g.*, *In re Detention of Traynoff*, 358 Ill. App. 3d 430, 444 (2005). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Manifestly, there can be no plain error where there is no error. *People v. Bannister*, 232 Ill. 2d 52, 71 (2008).

¶ 56    We cannot say, with respect to any of the information respondent identifies, that it was error for the trial court to allow the experts to testify that they based their opinions on that information.

¶ 57    We begin with respondent's criminal history. Respondent first challenges Wood's reliance on respondent's extensive *arrest* history. Though respondent also asserts that there was "no *** foundation" for *Quackenbush's* reference to respondent's prior arrests, respondent develops an argument only with respect to Wood's testimony. For that reason alone, we could, arguably, conclude that any error with respect to Wood's reliance on respondent's arrest history was harmless. Nonetheless, we choose to address the claim of error.

¶ 58    Respondent argues that the State's foundation for eliciting respondent's arrest history

from Wood fell short of the foundation the State provided, and this court approved, in *In re Commitment of Doherty*, 403 Ill. App. 3d 615 (2010), also a proceeding under the SVP Act.

¶ 59    In *Doherty*, the respondent filed a motion *in limine* seeking to exclude evidence of his "nonsexual criminal history, including traffic offenses, unlawful possession of a stolen motor vehicle, driving under the influence of alcohol, driving on a suspended license, battery, disorderly conduct, and vehicular invasion." *Id.* at 617. In response, the State "argued that respondent's entire criminal history, including his nonsexual criminal history, was relevant in determining whether respondent suffered from a mental disorder and was substantially likely to reoffend." *Id.* The trial court ruled "that the State's expert witnesses could testify regarding respondent's nonsexual criminal offenses," provided "the State lay the proper foundation that the evidence was regularly relied on by experts in their field." *Id.* at 618. The trial court also said that it would "give a limiting instruction informing the jury that the testimony was being offered to illustrate what evidence the expert witnesses relied on in forming their opinions and not as substantive evidence of the underlying offenses." *Id.* After the respondent was committed, he appealed, arguing that the trial court erred in admitting evidence of his nonsexual offenses. *Id.* at 624.

¶ 60    This court affirmed. We began by noting that section 35(b) of the SVP Act (now 725 ILCS 207/35(b) (West 2008)) provided:

> "*At the hearing on the [commitment] petition it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were imposed*. The petitioner may present expert testimony from both the Illinois Department of Corrections evaluator and the Department of Human Services psychologist." (Emphasis added.)

Thus, we noted, the SVP Act authorized "the admission of respondent's criminal history, sexual or nonsexual." *Doherty*, 403 Ill. App. 3d at 624. The respondent's criminal offenses, sexual or nonsexual, were "relevant in assessing [his] judgment and the extent to which [he] respected or followed the law or restrictions imposed on him by a prior conviction." *Id.* We next noted the precautionary measures taken by the trial court in regard to the evidence of the respondent's criminal history:

> "[I]n allowing the evidence, the trial court required the State to lay a proper foundation that the evidence was regularly relied on by experts in their field in forming opinions. See [*People v. Swanson*, 335 Ill. App. 3d 117, 125 (2002)] (allowing an expert to rely on reports made by others to formulate an opinion as long as other experts in the field reasonably rely on such materials). Third, the trial court's ruling reflected a thoughtful consideration of the probative value of the evidence as well as its prejudicial effect on respondent. See [*People v. Winterhalter*, 313 Ill. App. 3d 972, 978 (2000)] (requiring the trial court to weigh the probative value and potential prejudicial effect of evidence). Toward that end, the trial court specifically stated that it would give a limiting instruction informing the jury that the testimony was being offered to illustrate what evidence the expert witnesses relied on in forming their opinions and not as substantive evidence of the underlying offenses. The trial court also discussed the matter during the jury instructions conference and instructed the jury accordingly. We conclude that no abuse

-14-

of the trial court's discretion occurred." *Id.*

¶ 61 Although *Doherty* reached the correct result, section 35(b) was, in fact, not necessary to our determination that the trial court properly allowed the experts to testify to the respondent's nonsexual offenses. Section 35(b) permits the substantive admission of past offenses; the section contains no proviso that past offenses may be considered only as bases for an expert's opinion. See *In re Detention of Hardin*, 238 Ill. 2d 33, 51 (2010) ("While the presence of prior convictions cannot be determinative of whether the subject of a [petition under the SVP Act] suffers from a mental disorder, those convictions may, however, provide substantial evidence of the presence of underlying behaviors and psychological traits that combine to meet the diagnostic criteria for a particular mental disorder."). The trial court in *Doherty*, however, did not admit the past offenses as substantive evidence, but, rather, it admonished the jury to consider them only in weighing the expert's conclusions. In affirming that decision, our first stated rationale was that section 35(b) "authorizes the admission of respondent's criminal history, sexual or nonsexual." *Doherty*, 403 Ill. App. 3d at 624. We noted, secondarily, that the trial court gave a limiting instruction on the use of the past offenses.

¶ 62 Notably, these rationales appear to have been offered by the *Doherty* court as independent and alternative. The first invoked a statutory provision under which evidence of the past offenses could be admitted as substantive evidence. The second relied on a long-standing common-law rule that inadmissible hearsay material may still be mentioned by an expert in explaining the basis for his conclusions. Because the trial court in *Doherty* gave a limiting instruction concerning the respondent's criminal history, our citation of section 35(b) was gratuitous and potentially misleading. Despite what *Doherty* may be read to suggest, compliance with section 35(b) is unnecessary where mention of the respondent's criminal history is allowed only to illustrate the bases for an expert's evaluation. The point is vital, for when past offenses are admitted as substantive evidence, rather than for a limited purpose, greater concerns about prejudice arise. Indeed, there might even be a question of whether an arrest that did not result in a conviction is a "past crime[ ]" under section 35(b). See *People v. Beshears*, 65 Ill. App. 2d 446, 460-61 (1965) (interpreting a like provision of the Sexually Dangerous Persons Act (Ill. Rev. Stat. 1963, ch. 38, ¶ 105-5) (now 725 ILCS 205/5 (West 2008)) as not applying to arrests that did not result in convictions). We need not decide that issue, however, because respondent's arrests were not admitted as substantive evidence under section 35(b).

¶ 63 As for the particulars of respondent's argument, he first asserts that Wood "failed to mention that other experts ever rely on simple arrests." Therefore, according to respondent, allowing Wood to testify to respondent's arrests went "beyond the already expanded reliance on nonsexual convictions in *Doherty*." We acknowledge that neither Wood nor Quackenbush specifically identified arrests as among the data, or arrest reports as among the sources, relied on by experts in the field. That fact is not dispositive, however. Police reports reflect arrests, though it is not exclusively their purpose, as not all police-citizen encounters result in arrests. As Quackenbush and Wood made no qualifications regarding the content of police reports relied on by other experts, their testimony may reasonably be read to imply that such experts rely on the arrests recorded in those reports. That such experts would consider arrests

material is further suggested by the expansive research pool Quackenbush and Wood described. They identified several types of documents, including (1) police reports; (2) DCFS reports; (3) presentence reports; (4) trial and appellate court decisions; (5) prison disciplinary decisions; and (6) health and medical records. Neither expert intimated that this was an exclusive list of data or sources cited by experts in the field, but rather each stated that these were "the *types* of documents" (emphasis added) on which experts rely. Judging by the sources specifically mentioned by the witnesses, the "types of documents" considered relevant by experts in the field occupy a broad cross-section of a respondent's behavioral history. Indeed, the witnesses' stated aims suggest that they cast a wide net in their research of respondent's background. Quackenbush testified that he consulted the Department of Corrections (DOC) master file, which he described as "a pretty comprehensive set of documents regarding a person *and* their involvement with the Department of Corrections" (emphasis added). Wood named not only the DOC master file but other sources as well. He indicated that his first step in evaluating respondent was to perform a "records review," with the aim of approaching his interview with respondent with "as much knowledge as possible." The sources Quackenbush and Wood specifically mentioned would have contained a wide range of data about respondent, including his own statements and admissions as well as opinions and observations of him and even accusations against him, couched in possibly multiple levels of hearsay. We cannot imagine why an expert, searching so widely for facts about respondent, would not also consider arrests as pertinent data. Hence, the "rap sheets" cited by Woods for respondent's arrest history would fall within the "types" of documents that he specifically mentioned and upon which an expert in the field would reasonably rely.

¶ 64    *Doherty* does not persuade us otherwise. *Doherty* simply does not speak to the issue of whether an expert, in explaining the basis for his conclusions under the SVP Act, may cite prior arrests that did not lead to convictions. *Doherty* dealt with convictions, not arrests, and there is no indication that this court was setting conviction as the minimum bar.

¶ 65    Nor, moreover, is there support in *Doherty* for requiring that the expert identify the alleged offense for which the respondent was arrested. Here, we note that, though Wood did not describe the 27 arrests he mentioned, Quackenbush did describe some of the offenses underlying the 23 or 24 arrests he saw in respondent's records. Specifically, Quackenbush testified that the offenses included traffic violations, battery, and domestic violence. Thus, it appears that at least some of the arrests were described in the experts' testimony. In any case, however, *Doherty* undercuts the suggestion that an expert's reliance on a respondent's arrest record may not be elicited unless the expert specifies the alleged offense(s) for which the respondent was arrested. The past offenses in *Doherty* ranged from traffic violations to battery. By accepting the relevance of such a diversity of offenses, we implied that the value of the evidence lay not so much in the suggestion of a tendency to commit any particular crime as in the indication of a general pattern of lawlessness, which supported the experts' diagnosis of an antisocial personality disorder in the respondent. *Doherty*, 403 Ill. App. 3d at 624 ("the evidence of respondent's criminal history, including the nonsexual offenses, was relevant in assessing the respondent's judgment and the extent to which respondent respected or followed the law or restrictions imposed on him by a prior conviction"). Likewise here, respondent's multiple arrests, even if unspecified, are relevant as bases for Wood's and

Quackenbush's diagnoses of a personality disorder with antisocial features. Such a diagnosis is pertinent to whether an offender meets the SVP Act's criteria. See *In re Commitment of Stevens*, 345 Ill. App. 3d 1050, 1063 (2004) (antisocial personality disorder suggestive of an inability to control one's behavior, and hence pertinent to whether the respondent was likely to engage in further acts of sexual violence).

¶ 66    We emphasize that, though the *Doherty* court affirmed on two independent rationales, namely that section 35(b) was satisfied and that the *Wilson* requirements were met, respondent's claim here in citing *Doherty* is only that the *Wilson* standards were not satisfied as they were in *Doherty*. We would not have held the State to the standards of section 35(b) in any event, because the trial court instructed the jury not to consider as substantive evidence the materials cited by the experts.

¶ 67    Also for this reason, our decision today does not conflict with *Beshears*. *Beshears* interpreted section 5 of the Sexually Dangerous Persons Act (Ill. Rev. Stat. 1963, ch. 38, ¶ 105-5) (now 725 ILCS 205/5 (West 2008)). Section 5 contained the following provision on evidence of past crimes, which was almost identical in wording to section 35(b) of the SVP Act: "At the hearing on the petition it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were inflicted." Ill. Rev. Stat. 1963, ch. 38, ¶ 105-5. At the trial in *Beshears*, the State elicited evidence that the respondent had been arrested on an allegation that he sexually molested a young girl. No expert testified, but a psychiatric evaluation of the respondent was admitted into evidence. The report did not mention the respondent's prior arrest. The trial court issued no limiting instruction regarding the prior arrest. At the conclusion of the trial, the respondent was adjudicated a sexually dangerous person. *Beshears*, 65 Ill. App. 2d at 448-51. The appellate court reversed, reasoning, *inter alia*, that the prior arrest should not have been introduced because "evidence of arrests is not competent to prove " 'commission of crimes' " per section 5. *Id.* at 461.

¶ 68    Here, as in *Beshears*, the jury was informed of respondent's prior arrests. In *Beshears*, however, the prior arrests were admitted as substantive evidence, while here the jury was admonished to consider the prior arrests only in evaluating the conclusions of the experts. Thus, the concerns addressed in *Beshears* are not present here.

¶ 69    Respondent also raises the question of "trustworthiness." "It is not," respondent maintains, "trustworthy to allow the introduction through an expert witness that the [r]espondent may have been arrested of [*sic*] up to 36 arrests." Respondent does not clarify whether, by "untrustworthy," he means that the sources the experts used were unreliable or, rather, that mere arrests cannot be trusted as an indicator of a dangerous propensity. Following his conclusory assertion, respondent proceeds to describe the facts and holding in *Chambers* without discussing their pertinence to this case.

¶ 70    In *Chambers*, the defendant claimed an insanity defense to the charge of murder. At trial, the defense presented expert testimony that the defendant's blood alcohol level at the time of the crime was between 0.25 and 0.35, depending on his metabolism, "that [he] was drug and alcohol dependent, that he suffered from *** an anti-social personality, a narcissistic personality, and an unspecified personality disorder with sadistic traits." *Chambers*, 259 Ill.

App. 3d at 632. The State presented expert testimony that, based on his actions, the defendant "was capable of reasoning and exerting judgment at the time of the crime." *Id.* at 633. The expert also testified to the defendant's offense history, including multiple charges of armed robbery, a charge of burglary, a charge of aggravated arson at age 12, and several moving violations. *Id.*

¶ 71    We reversed the defendant's conviction, holding that the prejudicial effect of his offense history outweighed its probative value. We noted that the offense history "bore mainly on whether defendant possessed a violent personality," but that the defense and prosecution experts were in essential agreement that the defendant had violent tendencies. *Id.* at 634-35. The insanity defense raised a different issue, however–whether the defendant's "intoxication at the time of the murder, coupled with his personality disorder or disorders, rendered him incapable of forming the requisite criminal intent when the crime occurred." *Id.* at 635. We held that "evidence of defendant's arrest at age 12 for arson and his many armed robberies of theaters and drug houses was not at all relevant to whether defendant was capable of forming the requisite criminal intent at the time of the murder." *Id.*

¶ 72    Although respondent does not suggest how the facts of *Chambers* bear upon the present case, we note that *Chambers* is readily distinguishable, as the prior crimes in that case were admitted as substantive, albeit indirect, evidence that the defendant had the requisite mental state when he committed the act charged. Here, by contrast, the trial court expressly told the jury that they were not to consider the prior arrests as substantive evidence in the case.

¶ 73    Respondent offers no other authority and develops no argument that the experts' citation of his prior arrests was unduly prejudicial.

¶ 74    Next, respondent argues that it was improper for the State to elicit from Quackenbush that he relied on an "indicated" finding by DCFS that, in 2003, respondent sexually molested his niece and another girl. An "indicated report" is a statutory term of art. Section 7.12 of the Abused and Neglected Child Reporting Act (325 ILCS 5/7.12 (West 2008)) requires DCFS to investigate reports of child abuse or neglect and to determine whether each report is " 'indicated,' " " 'unfounded,' " or " 'undetermined.' " *Id.* DCFS will indicate a report if it determines that there is "credible evidence" of abuse or neglect. 89 Ill. Adm. Code 300.110(i)(3)(A) (2012). "Credible evidence" means that the available facts, when viewed in light of the surrounding circumstances, would cause a reasonable person to believe that the child was abused or neglected. 89 Ill. Adm. Code 300.20 (2012). An indicated finding remains on the state central registry for a minimum of five years. 325 ILCS 5/7.12 (West 2008).

¶ 75    Respondent refers us to our supreme court's observation that challenged indicated findings have a "strikingly high" (74.6%) rate of reversal (*Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 280-81 (2004)). Respondent also notes this court's decision in *In re K.S.*, 365 Ill. App. 3d 566, 578 (2006)), an abuse and neglect proceeding, where we vacated that aspect of the trial court's dispositional order that required the respondent to submit to a sex offender assessment. We noted that the trial court "never heard *any* direct evidence that respondent had committed any sexual offense." (Emphasis in original.) *Id.* at 571. We also noted that the criminal case against the respondent, which

involved the same allegation–that the respondent sexually abused his girlfriend's child–had been dismissed. Though there was an indicated finding by DCFS that the respondent abused the child, we observed (citing *Lyon*) that "[l]abelling evidence as credible in no way denotes that the evidence comports with rules of evidence or procedural due process." *Id.* at 572. We further remarked that "[a] finding by a DCFS worker, as capable as the worker may be, does not obviate the need for the State to produce evidence of alleged offenses and for a judge to find, by a standard more exacting than 'credible,' that an offense was committed." *Id.*

¶ 76 Respondent contends, based on *Lyon* and *K.S.*, that indicated findings "could not possibly be something that other experts in the field rely on." Respondent overlooks, however, an elementary difference between this case and *K.S.*, which is that there is no dispute (and in fact it was stipulated at trial) that respondent was convicted in 2003 of aggravated criminal sexual abuse. That fact by itself meets the first criterion under the SVP Act, which is that the subject of the petition has been convicted of a sexually violent offense (725 ILCS 207/15(b)(1)(B) (West 2008)). The mere fact of a conviction of that type has other relevance as well. Significantly, the DCFS report and indicated finding were referenced only when Quackenbush was asked to share the details of the offense. In *Doherty*, we considered the respondent's criminal history relevant without noting the details of the crimes (it was unclear whether any such details were admitted into evidence). Here, the fact alone of respondent's multiple arrests and convictions, including the conviction of aggravated criminal sexual abuse, was a ground for the experts' diagnoses of respondent with a personality disorder with antisocial features.

¶ 77 Respondent next notes that Quackenbush and Wood gave different ages for the victims in the 2003 sexual abuse case. Quackenbush testified that both victims were 10 when the abuse occurred, while Wood testified that the victims were 10 and 6. Respondent suggests that Wood's testimony "raise[s] a possible competency question as to whether a 6 year old could in fact provide trustworthy information." Respondent, however, cites cases only on when a child is deemed competent to *testify in court*. He cites no authority on the ability of a child to provide statements in the context of a criminal investigation. Moreover, it is not apparent how vital the child's own statements were to the investigation in the 2003 case. Most important is that, however the investigation proceeded, respondent was ultimately convicted of aggravated criminal sexual abuse in 2003. This is not the forum for respondent to challenge that conviction.

¶ 78 Next, respondent challenges the experts' reliance on various other aspects of his offense history. First, he notes that, though he was charged with possession of a stolen vehicle in connection with his assault of a female acquaintance and theft of her car, the stolen-vehicle charge "was dismissed through a negotiation to aggravated battery." The record page to which he directs our attention, however, simply contains Wood's testimony that the case resulted in convictions of two counts of aggravated battery. Wood mentioned nothing about a "negotiation" or a dismissal of the stolen-vehicle charge. In any case, even if it was later dismissed, the charge, and the earlier arrest, were competent factors for the State's experts to consider in conducting their evaluations under the SVP Act. Respondent cites no authority that bars such use of arrest and charging records, and so we cannot conclude that the trial court erred in allowing the experts to mention their reliance on those records. Similarly,

though respondent's niece ultimately decided not to press charges for respondent's alleged assault of her, there was no error in the court permitting the State to elicit from the experts that she claimed an assault occurred.

¶ 79 Respondent also objects that Wood referenced respondent's use of "aliases" without identifying when and how the aliases were supposedly used. Wood made the remark while explaining how he concluded that respondent has a personality disorder with antisocial features:

"I looked at [respondent's] long history of engaging in behaviors that placed him at risk for and ultimately resulted in his being arrested, the fact that he has used people without[,] in my opinion[,] any regard for their rights, their concerns, their welfare. He has manipulated individuals. *He has used aliases.* He has engaged in a number of criminal behaviors and that that [*sic*] pattern of so engaging in those behaviors has existed for a very long time." (Emphasis added.)

Wood evidently regarded respondent's use of aliases as akin to his arrests in exhibiting disregard of laws and social mores. Because use of an alias is, in most contexts, wrongful, it was proper for Wood to rely on the fact alone that respondent used aliases.

¶ 80 Respondent also challenges Wood's reliance on respondent's possession of "hooch" while in prison. Wood testified that he found this incident significant because respondent had denied having a substance abuse problem. Respondent asks:

"Do other experts rely on the possession of fermented liquor in [an inmate's] cell? What bearing does having fermenting liquor in [respondent's] prison cell relate to a substance abuse issue? What effect does a single alcohol related occurrence in over thirty years weigh in Dr. Wood's testimony?"

¶ 81 We think the "hooch" incident, for which prison authorities disciplined respondent, is more important for what it shows about respondent's respect for authority. It was yet another incident that explained the diagnosis of a personality disorder with antisocial features.

¶ 82 Finally, respondent claims that the trial court, in addition to failing to enforce the foundation requirements, "failed to consider the probative value of each statement as well as its prejudicial effect on [respondent]." Respondent observes that, in *Doherty*, this court commented that the trial court's ruling "reflected a thoughtful consideration of the probative value of the evidence as well as its prejudicial effect on [the] respondent." *Doherty*, 403 Ill. App. 3d at 624. We recognize, of course, that "the basic test for admissibility of any evidence *** is whether its probative value outweighs its prejudice." *People v. Turner*, 373 Ill. App. 3d 121, 131 (2007). It appears here as if the trial court did not expressly conduct that balancing. Respondent, however, refers us to no authority that a trial court must always make its balancing of these factors explicit for the record. In fact, there is authority to the contrary. In *People v. Watkins*, 206 Ill. App. 3d 228, 245 (1990), the court said:

"Although the trial court must weigh factors relating to the prejudice and probative value of evidence *** in reaching its determination as to the admissibility of that evidence, the court is not required to make an express evaluation in open court of those factors. [Citation.] Rather, absent an express indication that the trial court was unaware of its obligation to balance these factors [citation], a reviewing court will assume that the

trial court gave the factors appropriate consideration. [Citation.]"

Nonetheless, it remains the preference of this court that the trial court articulate, for the record, its weighing of the probative value and prejudicial effect of the proposed evidence. Here, though it would have been better for the trial court to express its thought process, we have, under the test in *Watkins*, no cause to believe that the trial court did not balance the factors as required.

¶ 83        Even if the trial court erred in allowing the experts to testify to any of the data respondent identifies, respondent has not demonstrated that the error was plain because it impacted a fundamental right or the evidence at trial was closely balanced. Aside from arguing simple error, respondent states only that "plain error should apply." Respondent thus fails to develop an argument that the error was *plain*. See *People v. Nieves*, 192 Ill. 2d 487, 503 (2000) ("Defendant's plain error argument consists of a single sentence asking us to employ the plain error rule because the right to a fair death penalty sentencing hearing is a fundamental right. The balance of his argument consists of explaining why the admission of the evidence was error, not plain error. He neither argues that the evidence was closely balanced nor explains why the error is so severe that it must be remedied to preserve the integrity of the judicial process. Accordingly, we find the argument waived."); see also Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived ***."). The only authority that respondent cites in asserting that the alleged error was *plain* is this court's decision in *Chambers*, whose facts and analysis we described above in determining that the trial court did not err. In *Chambers*, the defendant argued that his trial counsel was ineffective for failing to challenge the admission of his offense history. *Chambers*, 259 Ill. App. 3d at 634. This court, upon concluding that the admission of the defendant's offense history was error, *sua sponte* invoked the plain-error doctrine and summarily, without analysis (or even any acknowledgment) of either prong of the doctrine, determined that there was plain error. *Id.* at 636. The court reversed on that basis, mooting the ineffectiveness claim. *Id.*

¶ 84        Respondent simply describes the facts and holding in *Chambers*, making no attempt to compare them to the case at hand. Of course, since *Chambers* did not acknowledge either prong of the plain-error doctrine, it is unknown why this court found the error to be plain–and, by extension, is it unclear how *Chambers* demonstrates *plain* error in this case. Not only does respondent fail to argue that the trial court's alleged error impacted a substantial right, he does not challenge the sufficiency of the evidence apart from the testimony at issue, and the independent evidence clearly was overwhelming. First, respondent was convicted of three sexually violent offenses. Second, the experts agreed that respondent suffers from paraphilia, specifically, a sexual attraction to nonconsenting females, and from a personality disorder with antisocial features. Wood diagnosed respondent with the additional disorder of pedophilia, or a sexual attraction to children. Third, both experts agreed that it is substantially probable that respondent will engage in further acts of sexual violence. They based their opinions on, *inter alia*, respondent's (1) age; (2) physical health; (3) mental disorders; (4) arrest, conviction, and disciplinary history; (5) failure to complete sex offender treatment; and (6) actuarial likelihood of recidivism. Respondent offered no evidence to rebut this abundant showing against him.

¶ 85        For the foregoing reasons, we find no error in the trial court's permitting the State's

experts to testify to respondent's past misconduct as it pertained to their evaluations. Moreover, any error in that ruling was harmless.

¶ 86                                    III. CONCLUSION

¶ 87        For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 88        Affirmed.