# Illinois Official Reports

## Appellate Court

---

### *People v. Berrios*, 2018 IL App (2d) 150824

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GABRIEL ENRIQUE BERRIOS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0824 |
| Filed | April 20, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 13-CM-2654; the Hon. Donald M. Tegeler Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Bruce Kirkham, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Lawrence M. Bauer, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Presiding Justice Hudson and Justice Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1 Section 25-5(a)(3) of the Criminal Code of 2012 (Code) (720 ILCS 5/25-5(a)(3) (West 2012)) makes it a misdemeanor offense for a person to have contact with street gang members after having been, *inter alia*, "ordered by a judge in any non-criminal proceeding to refrain from direct or indirect contact with a streetgang member or members." After a bench trial, defendant, Gabriel Enrique Berrios, was convicted of violating this statute and sentenced to 30 days in the county jail. On appeal, he contends that the statute is unconstitutional, that he was not proven guilty of the offense beyond a reasonable doubt, and that the trial court erred in admitting hearsay evidence. We affirm.

¶ 2 The relevant facts are not in dispute. In 2012, the State filed a civil complaint under the Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/1 *et seq.* (West 2012)), which targeted 35 named individuals and "all *** unnamed" individuals who were members of the Latin Kings street gang in Aurora. The complaint sought to hold members of the gang accountable for monetary damages and enjoin its members from further gang activity. In particular, the injunction sought to prohibit members from such activities as carrying weapons, selling drugs, drawing graffiti, and "[s]tanding, sitting, walking, gathering, meeting, or appearing anywhere in public view" with any other member of the Latin Kings or with a member of any other street gang. See People v. Latin Kings Street Gang, et al., No. 12-CH-1898 (Cir. Ct. Kane County).

¶ 3 Defendant was named as a party in the State's civil complaint. More specifically, the complaint alleged that defendant had been found in possession of a stolen gun and had fled from the police as part of Latin Kings' criminal activities. Evidence attached to the complaint indicated that defendant had identified himself as a member of the Latin Kings, that he had numerous encounters with the police while in the company of other known members of the gang, that he had tattoos consistent with Latin Kings symbols, and that he had been observed displaying the gang's "colors" and hand signals.

¶ 4 Defendant was personally served with a summons and a copy of the civil complaint on May 26, 2012. The summons instructed defendant to appear in court "to answer the complaint in this case" and further advised defendant that a default judgment could be "entered against [him] for the relief prayed for in the complaint." On December 12, 2012, the State filed a motion for a default judgment against defendant. According to the State's motion, on July 10, 2012, which was the first court date on the State's complaint, defendant personally appeared in court without counsel. Thereafter, defendant did not return to court; he did not file a written appearance or answer the State's complaint. On December 21, 2012, the trial court (Judge Joseph M. Grady) entered a default judgment against him. Notice of the entry of the default judgment was mailed to defendant on January 11, 2013, which brings us to the instant criminal case.

¶ 5 According to the State's misdemeanor complaint, on July 4, 2013, defendant was arrested for having unlawful contact with a street gang member. See 720 ILCS 5/25-5(a)(3) (West 2012). Prior to trial, defendant sought to have section 25-5(a)(3) or the injunction declared unconstitutional because it impermissibly interfered with his first amendment right to freedom of speech. The trial court (Judge Donald M. Tegeler Jr.) ultimately denied the motion.

¶ 6 Although we do not have a transcript of these misdemeanor proceedings, our review is made possible by an unusually comprehensive 39-page single-spaced agreed statement of

facts. See Ill. S. Ct. R. 323(d) (eff. July 1, 2017). We say unusually because most alternatives to transcripts this court receives lack such specificity. For this, the parties have our appreciation.

¶ 7 At the start of defendant's trial, the parties jointly asked the court to take judicial notice of "the entire court file" in the civil case. The court granted their request. Then, two Aurora police officers testified that, at around 5 a.m. on July 4, 2013, officers were called to the scene of a disturbance in the parking lot of an apartment complex on the west side of Aurora. When the officers arrived, they learned that defendant was attempting to mediate a dispute between two young men—Angelo Parra and Noel DeLuna. Parra and DeLuna had arrived at the apartment complex in separate cars; however, witnesses told the police that defendant and Parra had arrived in the same vehicle. One of the officers, Aaron Spooner, testified that, when he arrived, he ordered defendant out of a car while another officer was speaking to Parra. Spooner testified that he "always had a good rapport with Mr. Berrios" and that defendant "did try to help calm things down" between Parra and DeLuna. Spooner overheard defendant refer to Parra as "King" and DeLuna as "White Boy."

¶ 8 Spooner was aware of the civil injunction entered against defendant, and he searched a computerized police database to determine whether Parra and DeLuna were listed as gang members. After the computer query, Spooner arrested defendant for having unlawful contact with street gang members.

¶ 9 Aurora police investigator Erik Swastek testified as an expert on street gangs. Specifically, Swastek testified that for the last three years, he had been a member of the Aurora Police Department's "Special Operations Group," or gang unit. A gang, said Swastek, is a group of three or more individuals who pursue common, and often criminal, goals. Swastek generally investigates gang-related crimes and had personally investigated between 120 and 150 gang-related offenses. Swastek also testified about the common patterns and practices of Aurora-area street gangs, including the Latin Kings. According to Swastek, the Aurora Police Department gathers information about local street gangs. Officers document all police contact with suspected gang members, and these "gang information sheets" are stored in a departmental database. Several criteria are used to determine an individual's relationship to a street gang, such as his or her self-identification, tattoos, clothing, jewelry, location, associates, and use of signs, graffiti, or hand signals. An individual may be listed as "inactive" in the database if he or she has not been the subject of a gang information sheet for at least one year.

¶ 10 As an expert on street gangs, Swastek opined that Parra was a gang member. Swastek testified that Parra had "at least seven, probably more" gang information sheets on file. One report from 2012 indicated that Parra "self-admi[tted]" that he was a gang member—specifically, a member of the Latin Kings. The gang information sheet from the day of the incident with defendant describes Parra as having a teardrop tattoo on his face. According to Swastek, a teardrop tattoo is common among gang members. Swastek also testified that defendant's reference to Parra as "King" was a way of acknowledging Parra as a fellow member of the Latin Kings. Swastek stated that, from his personal knowledge, he could not say whether Parra was a "currently active" member of the gang at the time of trial, but that Parra was listed in the database as an "active" gang member on the day of the incident. On cross-examination, Swastek testified that Parra was the subject of five gang information sheets rather than seven. (As it bears on the issues below, we note that no gang information sheets were introduced as evidence.)

¶ 11    As part of defendant's case in chief, occurrence witness Sabrina Landeros testified that "at no point" did she see defendant and Parra in the same vehicle. Landeros further stated that defendant was asked by "the officer" to go and talk to Parra and DeLuna.

¶ 12    After the parties' arguments, the trial court found defendant guilty. In its ruling, the court noted evidence that defendant had been served with the complaint in the civil case and that a default judgment was entered. The court stated that it would not consider defendant's argument that the injunction was unlawful or unconstitutional, as any challenge to the injunction "need[ed] to be raised with the civil court." Instead, the court found that the injunction was in full force and effect on the day of the offense and that, because he was served with the complaint, defendant had constructive notice of the injunction. The court found that there was unrebutted expert testimony that Parra was a member of the Latin Kings and that defendant knew that Parra was a gang member, since he referred to him as "King." The court noted that section 25-5(a)(3) required the State to prove not that Parra was a member of the Latin Kings specifically, but rather that defendant knew that Parra was a member of any street gang. The court stated that it did not believe Landeros's testimony that defendant and Parra were not in the same vehicle. However, the court noted that, even if defendant's only contact with Parra was when they spoke outside of the vehicles, defendant was still guilty of the offense; according to the court, "[t]he length of the contact [wa]s not important" because defendant was enjoined from having *any* direct or indirect contact with *any* street gang member. To the extent the court felt that defendant should be applauded "for trying to help," that fact did not negate guilt because defendant knew that Parra was a gang member and that he could not have contact with him either in the car or in the parking lot. Accordingly, the court found defendant guilty and, as noted, he served 30 days in the county jail.

¶ 13    Before this court, defendant contends that (1) section 25-5(a)(3) of the Code is unconstitutional, (2) he was not proven guilty beyond a reasonable doubt, and (3) evidence of Parra's gang membership was "inadmissible hearsay." We will postpone our examination of the constitutionality of section 25-5(a)(3), as we must first consider all issues that do not require passing judgment on a statute. See *People v. Oshana*, 2012 IL App (2d) 101144, ¶ 20 (citing *People v. Carpenter*, 228 Ill. 2d 250, 264 (2008)). We therefore consider the sufficiency of the evidence and the admission of the evidence of Parra's gang membership. Because these two arguments are interrelated, we address them together.

¶ 14    With respect to the sufficiency of the evidence, in a criminal trial, the State carries the burden of proving beyond a reasonable doubt each element of an offense. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). It is for the trier of fact to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. *Id.* at 228. Thus, on review, the relevant question is not whether the State met its burden but whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 224. Accordingly, a criminal conviction will be set aside only where the evidence was so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.* at 225.

¶ 15    The statutory scheme at issue in this case includes portions of the Code as well as the Act. The Code defines the offense of unlawful contact with street gang members as follows:

"(a) A person commits unlawful contact with streetgang members when he or she knowingly has direct or indirect contact with a streetgang member as defined in Section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act after having been:

　　(1) sentenced to probation, conditional discharge, or supervision for a criminal offense with a condition of that sentence being to refrain from direct or indirect contact with a streetgang member or members;

　　(2) released on bond for any criminal offense with a condition of that bond being to refrain from direct or indirect contact with a streetgang member or members;

　　(3) ordered by a judge in any non-criminal proceeding to refrain from direct or indirect contact with a streetgang member or members; or

　　(4) released from the Illinois Department of Corrections on a condition of parole or mandatory supervised release that he or she refrain from direct or indirect contact with a streetgang member or members.

　　(b) Unlawful contact with streetgang members is a Class A misdemeanor." 720 ILCS 5/25-5(a), (b) (West 2012).

Under section 10 of the Act, a street gang member is anyone "who actually and in fact belongs to a gang." 740 ILCS 147/10 (West 2012). Section 10 further states:

" 'Streetgang' or 'gang' or 'organized gang' or 'criminal street gang' means any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." *Id.*

The Act further provides:

" 'Course or pattern of criminal activity' means 2 or more gang-related criminal offenses committed in whole or in part within this State when:

　　(1) at least one such offense was committed after the effective date of this Act [(see Pub. Act 87-932 (eff. Jan. 1, 1993) (adding 740 ILCS 147/1 *et seq.*))];

　　(2) both offenses were committed within 5 years of each other; and

　　(3) at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony under the Criminal Code of 1961 ***." *Id.*

¶ 16　　As noted, defendant was convicted of a violation of section 25-5(a)(3) of the Code on the basis that he knowingly had contact with Parra, a gang member, after defendant had been ordered to refrain from direct or indirect contact with any street gang member. Defendant does not dispute the trial court's finding that he had constructive notice of the injunction. Defendant also does not dispute the veracity of Spooner's testimony that he heard defendant refer to Parra as "King." Defendant also does not challenge Swastek's qualifications as an expert. Instead, defendant contends that the State failed to prove beyond a reasonable doubt that the Latin Kings were a street gang and had committed two or more gang-related offenses after January 1, 1993, within five years of each other. Defendant also contends that there was insufficient evidence to show that Parra was actually a member of the Latin Kings or of any street gang. Finally, defendant contends that it was plain error for the trial court to admit Swastek's opinion testimony concerning Parra, which Swastek based on gang information sheets because,

according to defendant, that information was improper hearsay, offered to prove the truth of the matter asserted.

¶ 17    After careful review of the record, we determine that defendant's arguments all miss the mark. With respect to the evidence of Parra's gang membership, defendant overlooks that Swastek did not testify as a lay person; if he had, we would agree that the testimony was improper because a lay witness may testify only to detailed, personally observed facts and opinions derived from those facts. See, *e.g.*, *People v. Fair*, 159 Ill. 2d 51, 86 (1994). But, here, Swastek testified as an expert witness—specifically, as an expert on street gangs—and his designation as an expert (which defendant does not challenge) rendered his testimony admissible.

¶ 18    Since 1981, Illinois courts have followed the rule of evidence that " 'prohibitions against the admission of hearsay do not apply when an expert testifies to underlying facts and data, not admitted into evidence, for the purpose of explaining the basis of his opinion.' " *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51 (quoting *People v. Lovejoy*, 235 Ill. 2d 97, 142 (2009)); see *Wilson v. Clark*, 84 Ill. 2d 186 (1981). This principle is now codified as Illinois Rule of Evidence 703 (eff. Jan. 1, 2011), which states as follows:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Of course, the underlying information must be sufficiently trustworthy to make the expert's reliance reasonable. *Hooker*, 2012 IL App (2d) 101007, ¶ 51. But, so long as these foundational requisites are met, "an expert is permitted 'not only to consider the reports commonly relied upon by experts in their particular field, but also to testify to the contents of the underlying records.' " *Id.* (quoting *Lovejoy*, 235 Ill. 2d at 143). As the United States Supreme Court recently stated, this form of expert testimony is offered not to prove the truth of the matter asserted but rather to explain the basis for the expert's opinion. See *Williams v. Illinois*, 567 U.S. 50, 57-58 (2012). In sum, under Rule 703, an expert may give an opinion based on hearsay if it is the kind of hearsay on which an expert in his field bases professional opinions.

¶ 19    We determine that the gang information sheets were a reasonable basis for Swastek's expert opinions in this case. Case law is replete with examples of gang experts' reliance on information from centralized computer databases—such as arrest records, police reports, offense reports, jail records, probation reports, and "contact cards"—as well as other reported or recorded statements that help flesh out the experts' understanding of gang customs, alliances, rivalries, activities, "territories," hierarchies, and membership. See, *e.g.*, *People v. Cavazos*, 2015 IL App (2d) 120444, ¶ 79; *People v. Clifton*, 342 Ill. App. 3d 696, 708 (2003); *People v. Jamesson*, 329 Ill. App. 3d 446, 460 (2002); *People v. Williams*, 262 Ill. App. 3d 808, 820 (1994); *People v. Jackson*, 145 Ill. App. 3d 626, 634 (1986); *People v. Calderon*, 98 Ill. App. 3d 657, 661 (1981). Such hearsay, which is "[not] available to an average layperson," is "probably the only way a nongang member can accumulate details of gang activity and membership rank." *Jackson*, 145 Ill. App. 3d at 634. Accordingly, as one court has stated, such hearsay reports "are the very things gang experts are reasonably *expected* to rely upon." (Emphasis added.) *Mendez v. Sherman*, No. 2:14-cv-1950-MCE-KJN (TEMP), 2016 WL

2753773, at *8 (E.D. Cal. May 11, 2016). There is, of course, a high potential for "others' opinions, rumors and gossip" to be introduced as "hearsay in disguise" in such circumstances. (Internal quotation marks omitted.) *People v. Robert P.*, 354 Ill. App. 3d 1051, 1062 (2005); *cf. People v. Washington*, 127 Ill. App. 3d 365, 386-87 (1984) (holding investigator's nonexpert opinion of defendant's gang membership inadmissible, as it was based solely on information from one unnamed informant). But here, Swastek explained that he relied on numerous sources, including his specialized training in gang investigations, his personal experience as a gang-crimes investigator, and his familiarity with the patterns and practices of Aurora-area street gangs. Swastek then brought that information to bear when analyzing each of Parra's five gang information sheets. We note that it would have been helpful if, on direct examination, Swastek had been asked to relate more specific detail from each of the five sheets. But while that information could have been more fulsome, we are nonetheless satisfied that Swastek's testimony was not merely repackaged hearsay; rather, it was evidence in its own right (see *United States v. Vera*, 770 F.3d 1232, 1239 (9th Cir. 2014)) and its admission was neither error nor plain error.

¶ 20    As it might bear on future cases, we note that it is critical to maintain the distinction between using information as the basis for an expert's opinion and treating that information as fact. That otherwise inadmissible evidence may serve as the basis for an expert's opinion does not mean that the evidence is admissible for some other purpose. "If for example the expert witness (call him A) bases his opinion in part on a fact (call it X) that the party's lawyer told him, the lawyer cannot in closing argument tell the jury, 'See, we proved X through our expert witness, A.' " *In re James Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992). To maintain this distinction, we note that it is critical that a jury receive appropriate limiting instructions during a trial. See generally *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 78 (noting the occasional confusion of jurors asked to consider aspects of expert testimony in different ways (citing David H. Kaye, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.7.2 (2d ed. 2010))). Here, however, defendant received a bench trial, and we see no indication that the trial court improperly considered Swastek's testimony.

¶ 21    Having rejected defendant's hearsay argument, we now turn to the sufficiency of the evidence. Again, in Swastek's expert opinion, Parra was a gang member. Swastek explained that his opinion was based on Parra's reported 2012 admission of his gang membership, Parra's reported teardrop tattoo, Spooner's report that defendant referred to Parra as "King," and Parra's association with defendant. As the trial court pointed out, Swastek's opinion on that evidence was never refuted. Accordingly, we determine that a trier of fact could reasonably conclude that Parra was a gang member.

¶ 22    We also determine that there was sufficient evidence that the Latin Kings are a street gang. We have previously held that "an expert on gangs may opine on the ultimate issue of whether an organization is a street gang engaged in a course or pattern of criminal activity without testifying to specific dates or incidents." *People v. Murray*, 2017 IL App (2d) 150599, ¶ 83 (citing *Jamesson*, 329 Ill. App. 3d at 460). Here, Swastek testified that he had been a member of the gang unit for three years and that the gang unit "track[s]" the Latin Kings and other street gangs. In so stating, Swastek expressed the opinion that the Latin Kings are, in fact, a street gang. Under our precedents, nothing more was required. See *id.* As with Swastek's testimony concerning Parra, however, we note that Swastek's testimony concerning the Latin Kings could have been more comprehensive. See, *e.g.*, *Jamesson*, 329 Ill. App. 3d at 449-52. Still, as

in *Murray* and *Jamesson*, we find that the evidence was sufficient to support a reasonable determination that the Latin Kings are a street gang—having engaged in a course or pattern of criminal activity—within the meaning of section 10 of the Act.

¶ 23 We turn next to defendant's first amendment challenge. Defendant asserts that section 25-5(a)(3) of the Code violates the first amendment because it "indefinitely criminalizes innocent contact with persons known or unknown to a defendant" to be gang members. Defendant acknowledges that in *Jamesson* we rejected a similar challenge and upheld a related subsection of the same statute, under which a defendant could be convicted of having unlawful contact with a street gang member after being ordered to refrain from such contact as a condition of his criminal supervision. But defendant here submits that *Jamesson* is distinguishable because a term of supervision necessarily has a definite endpoint. By contrast, an injunction like the one in this case may be of indefinite duration, resulting in "potentially life-long limitations on a person's right to free speech" under the first amendment.

¶ 24 In general, statutes are presumed constitutional, and a statute will be construed in a manner that upholds its constitutionality if doing so is reasonably possible. *People v. Relerford*, 2017 IL 121094, ¶ 30. Whether a statute is constitutional is a question of law, which we review *de novo*. *Id.*

¶ 25 We note at the outset that the right described by defendant—*i.e.*, the right not to be indefinitely prohibited by a court order from having contact with gang members—is not specifically found in the United States Constitution (or, for that matter, our state constitution). Moreover, defendant has cited no authority, and our own research has turned up none, in support of his position. Finally, we point out that the United States Supreme Court has explained that there is generally no recognized "First Amendment 'right of association' " applicable to "social contact between gang members." *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999); *cf. Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984) (discussing limited recognition of the rights of "intimate association" and of "expressive association").

¶ 26 That said, as we explained in *Jamesson*, the first amendment has limits and speech is *not* protected when it is integral to criminal conduct. *Jamesson*, 329 Ill. App. 3d at 453; see also *Relerford*, 2017 IL 121094, ¶ 33 (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)). That a criminal act takes the form of speech does not mean that the notion of free speech relieves the speaker from all consequences. Were it otherwise, this all-encompassing notion of free speech would cancel all laws against disseminating state secrets or child pornography, engaging in a conspiracy or soliciting another to commit a crime, making actual threats, or publishing information that could lead to the harassment of witnesses or jurors. In such cases, words beget action. For example, in *Chicago Real Estate Board v. City of Chicago*, 36 Ill. 2d 530 (1967), our supreme court upheld a fair-housing ordinance that prohibited certain solicitations to sell or lease property on the basis of racial preferences. The ordinance was upheld because bias-motivated speech, when it is "an integral part of unlawful conduct, has no constitutional protection." *Id.* at 552-53. In that regard, we see no real distinction between the fair-housing ordinance and section 25-5(a)(3). Both laws target the speaker and his or her intent when speaking, rather than merely the content of his or her statements.

¶ 27 While we agree with defendant, at least in theory, that an endless restriction on his speech rights could *at some point* become so burdensome as to violate the first amendment, that problem has little to do with section 25-5(a)(3) specifically and more to do with the underlying injunction. See generally *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 762 (1994)

(distinguishing between a challenge to a statute and a challenge to an injunctive order predicated on a statute). Given the posture of the case here, compliance with the court order must prevail over the frustration of defendant's constitutional liberties—or at least those liberties as defendant sees them. *Cf. Morales*, 527 U.S. at 53. On this point, although defendant helpfully quotes authority from our supreme court's decision in *People v. Nance*, 189 Ill. 2d 142 (2000), he does so only in part. We find that a slightly longer quotation proves more illuminating:

"The problem with [defendant's] argument is that it overlooks basic principles governing injunctions. It is true that an injunction can be modified or dissolved when the court finds that the law has changed or that equity no longer justifies a continuance of the injunction. An injunction remains in full force and effect, however, until it has been vacated or modified by the court which granted it or until the order or decree awarding it has been set aside on appeal. *Unless it has been overturned or modified by orderly processes of review, an injunction must be obeyed, even if it is erroneous.* [Citation.]" (Emphasis added.) *Id.* at 145.

A default judgment is no exception, for an injunction based on a complaint "served upon persons made parties therein and within the jurisdiction, must be obeyed by them, however erroneous the action of the court may be." *United States v. United Mine Workers of America*, 330 U.S. 258, 293-94 (1947). In fact, "[t]he only possible exception to the rule that an erroneous or even unconstitutional injunction *** must nevertheless be obeyed is where the injunction is transparently invalid or has only a frivolous pretense to validity." *People ex rel. Watson v. Spinka*, 58 Ill. App. 3d 729, 734 (1978) (citing *Walker v. City of Birmingham*, 388 U.S. 307, 315-16 (1967)). Those certainly are not the facts of this case. In short, even if defendant believed that the injunction was unconstitutional, no matter how sincere his belief might have been, he had no lawful basis to refuse to obey it.

¶ 28        Although defendant argues that the *statute* prohibiting contact with street gang members is unconstitutional because it incorporates a *potentially* unconstitutional injunction, any flaw here would be with the injunction, not the statute. Thus, any injury to defendant's free-speech rights was entirely the result of his own inaction. Indeed, defendant could have done any number of things to contest the scope of the injunction. He could have filed a motion in civil court to have the default judgment vacated within 30 days (see 735 ILCS 5/2-1301 (West 2012)), or if that was demonstrably not possible, he could have returned to the civil court by way of a collateral petition within two years of the judgment (see 735 ILCS 5/2-1401 (West 2012)). He could have even sought an injunction on the injunction in state or federal court. See generally 42 U.S.C. § 1983 (2012) (providing a civil action for deprivation of rights, privileges, and immunities secured by laws or the constitution). Better still, defendant could have answered the State's civil complaint.

¶ 29        Instead, however, defendant never challenged the injunction, and as the trial court correctly recognized, defendant's failure to do so does not render section 25-5(a)(3) of the Code susceptible to his constitutional challenge. That the penalty for defendant's violation of the injunction was visited upon him by statute rather than by, say, a contempt proceeding is a distinction without a difference. Criminal penalties "have uniformly been recognized as a proper judgment for the violation of a prohibitory injunction of a civil nature" in order "to vindicate the authority of the court." *Rothschild & Co. v. Steger & Sons Piano Manufacturing Co.*, 256 Ill. 196, 201 (1912). In other words, defendant could no more complain about section

25-5(a)(3) on the basis of the civil injunction than he could about a contempt proceeding to enforce the injunction.

¶ 30 To recap: There was sufficient evidence to support defendant's conviction, there was no plain error in the admission of Swastek's testimony, and defendant has failed to establish that section 25-5(a)(3) violates the first amendment. Accordingly, we affirm the judgment of the circuit court of Kane County. In addition, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 31 Affirmed.