# Illinois Official Reports

## Appellate Court

---

### *In re Commitment of Montanez*, 2020 IL App (1st) 182239

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF JOSE MONTANEZ (The People of the State of Illinois, Petitioner-Appellee, v. Jose Montanez, Respondent-Appellant). |
| District & No. | First District, Third Division<br>No. 1-18-2239 |
| Filed<br>Rehearing denied | May 6, 2020<br>September 10, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-80023; the Hon. Peggy Chiampas, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael R. Johnson, Kate E. Levine, and Ian C. Barnes, of Johnson & Levine LLC, of Chicago, for appellant.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Evan B. Elsner, Assistant Attorneys General, of counsel), for the People. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Jose Montanez, pleaded guilty to murder and aggravated criminal sexual assault based on a crime he committed in Illinois in 1987. As his 40-year sentence was expiring, the State petitioned to commit respondent as a sexually violent person (SVP). At the commitment hearing, which consisted solely of competing expert testimony, the trial court found that respondent so qualified and ordered him committed.

¶ 2    Respondent says the evidence was insufficient to support the finding. He also claims that the trial court improperly considered the underlying bases of the experts' testimony for its truth and that the court improperly mischaracterized one expert's testimony. We find the evidence sufficient to support the finding and no error committed by the court. We thus affirm.

¶ 3                                    BACKGROUND

¶ 4    In 1992, respondent was arrested in California after allegedly attempting to rape two women at the apartment complex where he worked. At the time of this arrest, he was also wanted in connection with a 1987 murder committed in Illinois. Because he was suspected of murder, California dismissed its charges and extradited respondent to Illinois.

¶ 5    Illinois then charged respondent with first degree murder, aggravated criminal sexual assault, and concealing a homicidal death stemming from that 1987 murder. During trial, defendant entered a blind guilty plea to one count of first degree murder, one count of criminal sexual assault, and the concealment charge. He was ultimately sentenced to 40 years' imprisonment. See *People v. Montanez*, 2013 IL App (1st) 110168-U, ¶ 2.

¶ 6    In October 2011, just before his anticipated release from prison, the State filed a petition under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2010)) to commit respondent to the Department of Human Services (DHS). In December 2011, the trial court found probable cause to believe that respondent was an SVP and transferred him to DHS.

¶ 7    Over the next few years, respondent remained in DHS custody while the parties conducted their expert discovery. In 2017, nearly six years after the probable-cause finding, the case proceeded to trial. The trial testimony consisted of three expert witness, two for the State and one for respondent. The parties stipulated to the qualifications of each expert.

¶ 8                              I. Dr. Allison Schechter

¶ 9    Dr. Allison Schechter performed respondent's SVP evaluation on behalf of the Illinois Department of Corrections (DOC). When conducting an SVP evaluation, she reviews "documentation from an offender's master file, attempt[s] to conduct a clinical interview, conduct[s] a risk assessment, formulat[es] a diagnosis, formulat[es] an opinion and then writ[es] a report." The master file "contains information such as relevant court documents,

police reports, and offender's Department of Corrections disciplinary record, medical records, and any other relevant documentation that's available."

¶ 10 In formulating her diagnosis and opinion, Dr. Schechter reviewed the documents in the master file. She also interviewed respondent in September 2011, while respondent was near the end of his prison sentence. Later in September 2011, she issued her first report, concluding that respondent was an SVP. She updated this report twice over the next six years, while respondent was held under the court's probable-cause finding with DHS. These updates were necessary to incorporate current records from the DHS Treatment and Detention Facility (TDF) as well as updating her diagnosis to conform to the newly released Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). Respondent declined a new interview during this update process. These updates did not affect her opinions on respondent.

¶ 11 Dr. Schechter diagnosed respondent with antisocial personality disorder and drug abuse disorders. These diagnoses were consistent among all three experts and were not contested at trial. However, Dr. Schechter also diagnosed respondent with "other specified paraphilic disorder. *** Nonconsenting females in a controlled environment."

¶ 12 She testified that, according to the DSM-5, a "paraphilia denotes any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature consenting human partners." A paraphilic disorder "is a paraphilia that is causing distress or impairment to the individual or whose satisfaction entails personal harm or risk of harm to others." Other specific paraphilic disorders are those "in which symptoms that are characteristic of a paraphilic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate" but do not meet the criteria for the eight specific paraphilic disorders. Additionally, the impairment must be present for at least a six-month period.

¶ 13 In Dr. Schechter's view, the "[e]vidence suggests Mr. Montanez has demonstrated a repeated pattern that *** is indicative of him having a sexual interest in sexual activity with females who are unwilling to engage in sexual activity with him. He seeks satisfaction of this paraphilic interest in a manner that entails personal harm or risk of harm to others." She found a "repeated pattern" based on the details of respondent's crimes contained in the master file. There was only evidence that respondent has committed three sex-related crimes: the Illinois murder, the attempted rape in California, and a charge for contributing to the sexual delinquency of a child from 1974.

¶ 14 First, the Illinois case. Dr. Schechter testified that "according to all documentation that I saw, the offense occurred in 1987 in Cook County. Mr. Montanez brought the victim back to his apartment, sexually assaulted her, strangled her to death, and then sexually assaulted her again after she was deceased." Doctor Schechter cited information in the documentation she reviewed indicating that respondent reportedly bragged to his friends about committing the crime by saying, "I f*** her, I killed her, and then I f*** her again."

¶ 15 After the murder in 1987, respondent fled to California. While in California, in 1991, the records indicated that respondent attempted to rape two women who lived in an apartment complex where he was working as a handyman. Dr. Schechter stated that "[a]ccording to police reports, photographs of the victims on the day of the offense as well as sworn testimony of the victims testifying under oath," respondent went over to the victims' apartment and told them that he "had a surprise for them, but he wanted them to come separately to see the surprise."

¶ 16    One of the victims followed. He led the victim to a vacant apartment where he "had set up an air mattress and had a hammer and duct tape." According the reports, respondent then attacked the victim and restrained her with duct tape. Respondent tried to remove the victim's pants but could not because she was wearing a belt. After subduing the first victim, respondent went back to the apartment to lure the second woman. The first victim was able to escape and alert her roommate that respondent had attempted to sexually assault her. The two women fought back, and respondent fled the scene. Though respondent was never convicted of the California crime, Dr. Schechter considered it because "it spoke to a pattern of behavior that has occurred over time."

¶ 17    As the final sex crime, Dr. Schechter considered a 1974 conviction for contributing to the sexual delinquency of a child. At the time, respondent was 17 years old. The doctor admitted that there was very limited information about this crime, but the limited information available showed that respondent was "known to be harboring and having sex with a 16-year-old girl who had been reported as missing to the police."

¶ 18    Dr. Schechter was specifically questioned about respondent's lack of sexual misconduct while incarcerated. Based on DOC records, respondent had relatively few misconduct tickets and absolutely none were, in any way, sexual in nature. Based on this, counsel asked how she could determine that respondent still had paraphilic disorder if he had not exhibited sexual misconduct since 1991. She responded that "based on all that I know about this disorder, this disorder is not likely to simply go away or remit on its own. It can be effectively managed with significant treatment, but it is not likely to simply go away on its own." Although it had been offered, respondent had not undergone therapy or treatment.

¶ 19    As noted above, Dr. Schechter also diagnosed respondent with antisocial personality disorder and various substance abuse disorders. She explained that these disorders "exacerbate the paraphilic disorder or make it worse. It makes it more likely Mr. Montanez will engage in criminal and violent behavior towards others without considering other people's rights or safety." For example, police records state that respondent indicated that "when he drinks he gets the urge to choke people. He was under the influence of substances at the time of his 1987 offense and at the time he was arrested in California." As for the antisocial personality disorder, it is indicated by a "disregard for the safety of others" and "lack of remorse, as indicated by being indifferent to or justifying having hurt, mistreated, or stolen from another."

¶ 20    Dr. Schechter also administered the Hare Psychopathy Checklist-Revised (PCL-R) to identify traits of psychopathy. Psychopathy "is a personality construct wherein individuals generally demonstrate a selfish callous and remorseless use of others. They have a difficult time accepting responsibility for their actions, and they generally lead a chronically unstable or antisocial lifestyle." Respondent scored a total of 30, "which places him in the 84th percentile rank. According to these scores, he demonstrates a high degree of psychopathic traits relative to adult male incarcerated offenders."

¶ 21    In calculating respondent's risk of reoffending, Dr. Schechter used the Static-99R and Static-2002R actuarials. She stated that these "are two of the widely used actuarial instruments used to assess the risk of sex offenders." These are "empirically derived tool[s] used to aid in the assessment of risk." Based on the actuarial calculations, Dr. Schechter determined respondent was at an "average" risk of reoffense.

¶ 22    However, the doctor explained that this was a baseline, average risk of reoffense for offenders whose profiles were similar to respondent's. These actuarials do not calculate an

offender's *individual* risk of reoffending. In fact, the developers of the actuarial instruments remind evaluators of the need to consider individual factors. To determine individual risk, an evaluator applies dynamic risk and protective factors. Dynamic risk factors are individual characteristics indicating an increased risk of reoffense, whereas protective factors indicate reduced risk.

¶ 23　　In evaluating respondent, Dr. Schechter considered a number of dynamic risk and protective factors. In her expert opinion, there were numerous risk factors that increased respondent's likelihood of reoffending. For example, she applied a "sexualized violence" factor. She applied this factor because, after reviewing the records, she concluded that respondent's

> "1987 Illinois offense and 1991 California offenses were both very violent and brutal in nature. Both of them involved him using strapping tape to restrain victims and involved the use of choking.
>
> 　　Records indicate that at the time of Mr. Montanez's California offense, he was married, which indicates that although he had consensual sexual activity available to him at that time, he continued to seek out situations of engaging in nonconsensual sex with a nonconsenting victim."

¶ 24　　She also considered various protective factors, including age, health, and sex offender treatment. She concluded that none of these factors applied. As for age, on cross, Dr. Schechter acknowledged that studies show a marked decline in recidivism for sex offenders older than 60. However, she declined to apply the protective factor because "any age-based risk reduction was taken into account in the scoring on the actuarial instruments. [Respondent] is not as yet of significantly advanced age enough to warrant an additional age-based risk reduction that was not already accounted for by the actuarial instruments." As for the actuarial reduction, each expert agreed that respondent was entitled to an automatic two-point reduction based on the fact he is over 60.

¶ 25　　There was also evidence that respondent has had numerous medical issues. He suffers from issues with his wrists and has worn braces on both wrists for over a decade. There was also some suggestion that he is suffering from a degenerative disorder in his back. Further, the medical records show that respondent has a history of herniation and colostomy. (The record is unclear as to whether he still had a colostomy bag at the time of the hearing.)

¶ 26　　The doctor recognized that respondent's "medical conditions appear to be chronic in nature and long-standing in nature." She concluded, however, that "none of these medical conditions while they may somewhat reduce his mobility, none of them are significantly debilitating or imminently life-threatening enough to warrant an additional medical-based risk reduction."

¶ 27　　Respondent never participated in sex offender treatment during his incarceration. And "[s]ince his arrival at the TDF since 2011, he has consistently refused to participate in any sex offender treatment."

¶ 28　　Dr. Schechter concluded that: "In my opinion, Mr. Montanez meets criteria to be found to be a sexually violent person." She believes that he is "substantially probable to reoffend," meaning "[m]uch more likely than not." She agreed that he is "dangerous because these mental disorders make it substantially probable he will engage in future acts of sexual violence."

¶ 29                              II. Dr. Edward Smith

¶ 30    Dr. Smith is an SVP evaluator working with the DHS. His testimony was substantially similar to Dr. Schechter's. He reviewed the same master file but, unlike with Dr. Schechter, respondent refused an interview. Like the other evaluators, he issued his initial report and subsequently updated it. While there were some minor changes, his conclusion did not change with these updates.

¶ 31    Dr. Smith also diagnosed respondent with antisocial personality and drug abuse disorders. And while Dr. Smith diagnosed respondent with paraphilia, it was slightly different than Dr. Schechter's diagnosis. Dr. Smith diagnosed respondent with "other specified paraphilic disorder, nonconsenting females with sadistic features in a controlled environment." Like Dr. Schechter's testimony, he also defined paraphilia, nonconsenting females as intense sexual arousal from sexual activity with nonconsenting persons; this "arousal is typically manifested either through sexual fantasies, sexual urges, or sexual behaviors."

¶ 32    While Dr. Schechter briefly described what the records told her about respondent's 1987 murder, Dr. Smith described it in greater detail. According to him, the records he reviewed indicated that:

> "On November 25, 1987, [respondent] was reportedly at a party where he met a female victim. He took the woman back to his apartment. At some point in the evening they were consuming alcohol and drugs. During the evening when he brought her back to the apartment, he eventually sexually assaulted her and strangled her to the point where she died.
>
> Prior to her passing away, [respondent] had indicated that she was unable to essentially ward him off due to her, I believe, level of intoxication. She told him to stop, but he continued to sexually assault and strangle her. He commented after—he commented that after he killed her, that he continued to eat and drink and that it didn't bother him at all. He had also reportedly bragged to friends that he had, quote/unquote, f*** her, killed her, and then f*** her again."

¶ 33    When asked how the paraphilia diagnosis fit respondent, he responded:

> "So the offenses that I had referred to earlier beginning with the 1987 offense and then proceeding to the [California] offense in 1991, so obviously over a period of a number of years, [respondent] engaged in sexual behavior with at least two nonconsenting adult females. Those interactions were considered to be physically and sexually violent and aggressive.
>
> During that course of time, he reportedly completed and attempted to complete the sexual assault in the midst of that level of sadistic features so the idea that he was somewhat aroused to causing or inflicting psychological and physical suffering on another person. Over the course of time, you know, he acknowledged statements making statements that he acknowledged committing the 1992 offense and records indicated that he also acknowledged and admitted to guilt in those during his guilty plea related to the trial we had talked about earlier."

¶ 34    Specifically, regarding sadistic features:

> "So sadistic features again involve the infliction of physical or psychological suffering on another individual. In the 1992 case, he reportedly engaged in sexual intercourse

with her against her will. While doing that, choked her and continued to choke her despite the fact that she indicated that she wanted him to stop.

"In the 1991 case, again physically assaulting her and then also throughout that process continuing to attempt to sexually assault her through that process suggest [*sic*] that there is some level of that infliction of physical or psychological suffering on the individual."

¶ 35 Dr. Smith also used the Static-99R and Static-2002R to calculate respondent's baseline risk of reoffending. His application of the actuarials resulted in the same risk as Dr. Schechter— "average." Based on the actuarial scores, Dr. Smith explained that, as a baseline, respondent was 1.38 or 1.39 times more likely to reoffend than the average sex offender.

¶ 36 Dr. Smith also considered various dynamic risk and protective factors. Dr. Smith applied, for example, a "deviant sexual interest" factor, which is "sexual interest that is outside of what would be considered normal consensual appropriate sexual interactions." He based this factor on the details of respondent's crimes as he understood them. He also elevated respondent's risk based on his diagnosis of antisocial personality disorder and the high PCL-R score on the test administered by Dr. Schechter.

¶ 37 Like Dr. Schechter, Dr. Smith did not apply any protective factors. He did not apply an age reduction because "as I mentioned earlier, he does get a reduction on the actuarial instruments for his age. In my opinion that in and of itself does not reduce his risk below that of substantial probability." Regarding respondent's medical conditions, he believes that they "do not appear to be debilitating conditions to the point that would significantly lower his risk to reoffend."

¶ 38 Dr. Smith also opined that respondent was "substantially probable to reoffend," meaning "much more likely than not." He agreed that respondent was "dangerous because he suffers from a mental disorder that is congenital or acquired." Specifically, "[o]ther specified paraphilic disorder, nonconsenting females with sadistic features in a control [*sic*] environment"; antisocial personality disorder; and the drug abuse disorders. He also agreed that "these mental disorders affect his emotional or volitional capacity and predispose him to make continued acts of sexual violence."

¶ 39 On cross-examination, Dr. Smith acknowledged that the creator of the Static-99R and Static-2002R conducted research in 2005, which concluded that the prior actuarials actually *overestimated* risk of recidivism as people age. This was "inconsistent" with Dr. Smith's opinion that the actuarials *underestimate* risk. Dr. Smith's contrary opinion was based on "the factors that are not considered on the actuarials." When pressed on how many dynamic risk factors are enough to deviate from the actuarials, he repeatedly insisted that "there is no particular cut-off number *** it's me that decides that."

¶ 40 Dr. Smith acknowledged that the *baseline* actuarial score would be insufficient to find respondent an SVP. But he again insisted that respondent qualified based on his *actual* risk.

¶ 41 The doctor also conceded that the drug abuse disorders are "not sufficient for civil commitment" and "typically" neither is antisocial personality disorder. Instead, in this case, he acknowledged that only "the diagnosis of other specified paraphilic disorder would be sufficient for commitment under the Act."

¶ 42                                   III. Dr. Lesley Kane

¶ 43    Dr. Kane was respondent's retained expert. Dr. Kane reviewed the same master file as the other two doctors and interviewed respondent in 2012. Based on her evaluation, she agreed with the State's experts' diagnoses of antisocial personality disorder and drug abuse disorders, though she did opine that the antisocial personality "has possibly dissipated to an extent." Her major disagreement was about whether respondent qualifies as an SVP.

¶ 44    She did not believe that respondent qualified for two reasons. First, his age. She testified that "the risk of recidivism particularly for rapists tends to decline pretty markedly after 60." Secondly, she did not "believe that [respondent] clearly meets a diagnosis, a paraphilic diagnosis." As for the paraphilia, she focused on the ratio of respondent's non-sex crimes to sex crimes. Dr. Kane testified that the records she reviewed indicated that respondent had more "non-sexual offenses," such as damage to property and burglary. This led her "to believe that [respondent's] behavior and the sex offenses too were more related to antisocial behavior."

¶ 45    She also highlighted respondent's disciplinary record while incarcerated. These records show that "[h]e had some major and minor tickets for a variety of different infractions. He didn't have any sexual misconducts"—despite having had contact with female employees at both the DOC and TDF. This was significant because "it lends support for a diagnosis of antisocial personality disorder if they have—if an individual has some history in a structured setting of sexual misconducts, that lends support for a paraphilic diagnosis."

¶ 46    When questioned about her disagreement with a paraphilia diagnosis, Dr. Kane testified that "there is not enough evidence to indicate a pattern or recurrent intense sexual arousal to non-consent." She highlighted that paraphilia must involve a *pattern* of "recurrent and intense" sexual arousal. She had the same conclusion for sadism: "there just isn't enough evidence to suggest that he is aroused by—or sexually aroused by the humiliation and suffering of another person."

¶ 47    Like the State's experts, Dr. Kane's application of the actuarials showed an average risk of reoffending. She applied a number of dynamic risk factors—"substance abuse, childhood criminality, personality disorder, history of emotional abuse, noncooperation with supervision. There might be one more that I'm not thinking of." However, unlike the State's evaluators, she concluded that protective factors should apply.

¶ 48    She first conceded that the "main" protective factor, sex offender treatment, did not apply. However, she believed that the age and medical conditions factors did. As for age, she noted that, at the time of the hearing, respondent was 61. She assigned this protective factor because "according to the Static-99-R, he gets a reduction in his score due to his age because research indicates that as they reach the age of 60, that it declines pretty markedly and particularly for individuals who have committed acts of rape."

¶ 49    As for his medical conditions, Dr. Kane identified his degenerative disk disease and wrist problems. While these issues do not have a "significant effect" on his ability to reoffend, "[t]here could be if there is—for individuals that are included to commit acts of rape, there is some that to be strong to a degree versus somebody who molests children doesn't need that type of strength or power over somebody. So there could be a little bit of a decline."

¶ 50    Ultimately, Dr. Kane concluded that "[she] do[es] not believe that Mr. Montanez meets the criteria as a sexually violent person under the Act."

¶ 51    On cross-examination, Dr. Kane noted that respondent denied sexually assaulting the murder victim during her interview with him. While discussing the 1987 crime, "[Respondent] indicated that it was consensual, that he choked her after the sex. So I don't know exactly—nobody knows exactly what went on because there is no victim to discuss that offense." The State asked whether she believed his statement of the crime. Her response: "I don't know. There is no evidence to suggest that it wasn't consensual, that the actual sex act wasn't consensual." The State then attempted to impeach her with a question from her deposition. In it, the State asked: " 'Do you believe his narrative? Answer. No.' " At trial, her response to this impeachment was "Right. I'm not disputing that he is an unreliable historian." On redirect, respondent's counsel pointed out that the impeachment statement—"Do you believe his narrative?"—was asked after a discussion of the *California* crime, not the Illinois murder.

¶ 52                              IV. Trial Court's Ruling

¶ 53    After closing arguments, the court found respondent to be a sexually violent person. In rendering judgment, the court explained its conclusion at length:

> "So Dr. Allison Schechter testified that Mr. Montanez, the Respondent, met the criteria to be found an SVP. He was convicted of a sexually violent offense that's under Case No. 92 CR 8560, where he did, and this is significant, plead guilty to first degree murder, aggravated criminal sexual assault, and a concealment of a homicidal death. In that particular case, Dr. Schechter testified, and under cross-examination as well, I find extremely credible that Mr. Montanez brought the victim to his apartment, that he sexually assaulted her, strangled her to death, sexually assaulted her again, and that the Respondent was quoted by a friend as stating, I f*** her. I killed her, and then I f*** her again. That he showed friends where the victim's body was buried. And that when the body of the victim was exhumed aside from putting her in the attic after a few days and then taking her down into the basement, digging a hole and covering her with cement, when that body was exhumed the victim was found to be restrained with duct tape."

¶ 54    The court found that last fact concerning the use of duct tape in the Illinois crime

> "particularly significant because duct tape was also used by Montanez in the California was in 1992 where he was changed with false imprisonment, battery and assault with a deadly weapon. That Dr. Schechter indicated that and there was extensive cross-examination regarding the doctor's findings, specifically regarding the aggravated criminal sexual assault and in my, this Court's opinion in assessing her credibility that she did find that these crimes or the crimes including the California case, and I will address that in a moment, were sexually motivated particularly indicating, I f*** her. I killed her. I f*** her again, in the California case in particular where the Respondent used duct tape in order to restrain one of the victims in this matter to the point of using that duct tape around her face that her nose was broken, her hands were bound as well, and I would base that on the testimony that Dr. Schechter reviewed and testified to, and that she did find, Dr. Schechter, that Respondent did meet the criteria."

¶ 55    The court continued by discussing Dr. Smith. It noted that

> "this was not, both doctors coming to that conclusion, not just specifically based on the Respondent pleading guilty to an aggravated criminal sexual assault, and I heard their testimony, but they gave through their testimony specific reasons and factors that were

subject to cross-examination that brought them to that conclusion, and which is in the record."

¶ 56    The court then discussed Dr. Kane. The court focused primarily on the State's "impeachment." The judge noted "Doctor Kane's answer, right. I'm not disputing that he is an unreliable historian." This statement was "very concerning to th[e] Court." The court determined that "Mr. Montanez was interviewed by Dr. Kane. She concedes that he is not a reliable historian, yet, her testimony elicited that based on his reporting, and she did not just take that into account, she did take into account the documents as she indicated, but I am not persuaded by Dr. Kane's assessment, her evaluation, nor her opinion regarding this case."

¶ 57    The court concluded: "I believe that the crimes, the offenses of 92 CR 8560 as [*sic*] the California case as well were sexually motivated. The testimony of Dr. Schechter and Dr. Smith support that." The court then found that the State had proven beyond a reasonable doubt that respondent was an SVP.

¶ 58    Respondent filed a posttrial motion raising a number of alleged errors. Pertinent here, in paragraph 11(b) of the motion, respondent claimed "[t]hat during the trial court's ruling, it erred in: *** accepting Dr. Schechter's and Dr. Smith's basis-of-opinion testimony as factual truth of which they had firsthand knowledge."

¶ 59    The court denied respondent's posttrial motion. In announcing that decision, the trial court began by doing a paragraph-by-paragraph discussion of the motion. However, the court stopped short of specifically articulating its reasoning on paragraph 11(b) before it denied the motion. The closest the court came to discussing the issue is when it articulated its basis for a different paragraph—"paragraph seven." The court stated it had

> "ruled that if Dr. Schecther and the other—the doctor's [*sic*] relied upon—and pursuant to Illinois the state pursuant to the SVP Act, which specifically allows for that. That if the doctor's [*sic*] relied on those records in forming their opinions, then those records that the doctor's [*sic*] reviewed to form the basis of their opinions are admissible and subject to cross. And I made such ruling specific with that in mind."

¶ 60    Respondent timely appeals the circuit court's finding that he is an SVP.

¶ 61                                ANALYSIS

¶ 62    On appeal, respondent claims that (1) the State failed to prove he was a sexually violent person beyond a reasonable doubt, (2) the court erred in taking the expert's basis of opinion testimony as true, and (3) the trial court misremembered and misrepresented the testimony of the defense expert whose opinion it rejected. We take these arguments in order before adding some thoughts of our own on the record presented in this case.

¶ 63                                   I

¶ 64    We begin with the sufficiency of the evidence. The Act allows the State to commit a criminal defendant, who is otherwise entitled to be released from incarceration, if it can prove he qualifies as an SVP. *In re Detention of Hardin*, 391 Ill. App. 3d 211, 216 (2009). The State must prove beyond a reasonable doubt that (1) respondent was convicted of a sexually violent offense, (2) he has a mental disorder, and (3) the mental disorder makes it substantially probable that he will engage in further acts of sexual violence. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20; see 725 ILCS 207/5(f), 35(d) (West 2016).

¶ 65     The Act defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016). When reviewing the court's determination that respondent is an SVP, we ask whether, "viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *Fields*, 2014 IL 115542, ¶ 20; *In re Commitment of Kelly*, 2012 IL App (1st) 110240, ¶ 31; *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 598 (2007). We must be mindful that our review does not permit us to reweigh the evidence or second-guess the credibility judgments of the trial court. See *Fields*, 2014 IL 115542, ¶ 27; *Lieberman*, 379 Ill. App. 3d at 602.

¶ 66     Respondent does not dispute that he was convicted of a sexually violent offense. He claims the State's experts failed to prove he had a mental condition or, if he had a condition, that it makes it substantially probable that he will engage in future acts of sexual violence.

¶ 67     As is the usual case, only experts testified at respondent's hearing. See *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 4 (*Gavin I*) ("As is common with commitment proceedings under the SVP Act, only expert witnesses testified."). Based on the testimony, the proofs come down to the competing diagnoses from the expert witnesses. Dr. Schechter and Dr. Smith diagnosed respondent with some form of paraphilia, nonconsenting, while Dr. Kane did not believe that there was enough evidence of a *pattern* of intense sexual arousal to confirm that diagnosis.

¶ 68     Respondent first argues that the evidence was insufficient to prove that he has a mental disorder which makes him substantially probable to reoffend. He focuses primarily on the predisposition (risk) aspect of "mental disorder," as opposed to the existence of a condition generally. He first cites his "average" risk computed by the actuarial scores. It is true that the evidence showed his "average" scores would likely not rise to the level required to find that respondent was "substantially probable" to reoffend. Dr. Smith admitted as much:

> "MR. COYNE [(RESPONDENT'S COUNSEL)]: And with regard to the 99R, that score of three gives him a 7.9 percent change of sexual recidivism over five years, right?
>
> DR. SMITH: Compared to a routine sample, yes.
>
> Q. And it is your opinion that that is substantially more likely to reoffend 7.9 percent change of reoffending?
>
> A. Again that statistic in and of itself, no.
>
> Q. So that particular score on the Static-99 does not mean he is much more likely to reoffend, does it?
>
> A. That percentage in particular, no.
>
> Q. And when we get to the Static-2002R, the second actuarial that you employed, his score was a four, is that correct?
>
> A. Correct.
>
> Q. And that particular score gives him a 9.7 percent chance of recidivism over five years, right?
>
> A. In a routine sample, yes.
>
> Q. And he is not unroutine except for the fact he's had a finding of probable cause to be in this proceeding, right?

A. I would consider him to be more of the high-risk category.

Q. Based on what?

A. Again, based on factors external to the instrument.

Q. Okay. So if you put him in the high-risk section, then he's only got a 16 percent chance of reoffending, correct?

A. In five years?

Q. Yes, sir.

A. Yes.

* * *

Q. And is it your opinion that a 16 percent chance of recidivism over five years is much more likely than not to reoffend?

A. Again, that statistic in and of itself, no."

¶ 69    Focusing solely on the actuarial scores is an untenable position. For one, all three doctors clearly testified that, in calculating an individual's personal risk, they must consider factors *beyond* the actuarials. Dr. Schechter and Dr. Smith explicitly indicated that their consideration of these factors—and lack of protective factors—was what raised respondent's risk to the level of "substantially probable."

¶ 70    Respondent acknowledges as much but attacks those experts' use of these dynamic risk factors. He isolates many of these factors and *factually* challenges their veracity. But the evidence at trial shows that these considerations are made by the experts, using their professional judgment. And our case law has relied heavily on the conclusions of experts in these cases. *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36 (*Gavin II*) ("The Illinois Supreme Court has not given us guidance as to what sort of factual predicate suffices to establish the presence of a mental disorder. Instead, it has relied heavily on expert testimony, deferring to the factfinder on expert credibility."); see also *Fields*, 2014 IL 115542, ¶¶ 21-27. The fact that respondent's expert, Dr. Kane, disagreed with Dr. Schechter and Dr. Smith on the conclusion about whether a mental condition makes him substantially probable to reoffend is not sufficient for us to conclude that the State failed to meet its burden of proof. See *In re Detention of White*, 2016 IL App (1st) 151187, ¶¶ 58-62 (affirming finding that respondent was an SVP despite fact that his expert disagreed with State's two experts—Dr. Schechter and Dr. Smith—on the presence of a mental disorder).

¶ 71    Respondent next argues that, "[e]ven if the State established that Mr. Montanez's likelihood of reoffending rises to the level of substantially probable, the State failed to prove the causal link between [respondent's] mental disorder and the substantial probability that he will reoffend that is required by the SVP Act." In response, the State argues that their experts' diagnosis of other specific paraphilic disorder is, by definition, causally linked to sexual reoffending.

¶ 72    As defined by the doctors, a "paraphilia denotes any intense and persistent sexual interest." Dr. Schechter and Dr. Smith testified that respondent's paraphilic disorder was a "qualifying mental disorder as defined by the Act." Again, the Act defines "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016).

¶ 73    What the State's argument fails to recognize is that, on this point, respondent is not challenging whether paraphilia "predisposes a person to engage in acts of sexual violence" but

- 12 -

whether that predisposition makes him "*substantially probable*" to reoffend. It is completely conceivable that a person could have a "mental condition" as defined by the Act without being "substantially probable" to reoffend. In fact, these *separate* proofs are the second and third elements articulated in *Fields*, 2014 IL 115542, ¶ 20 ("(2) he has a mental disorder; and (3) the mental disorder makes it substantially probable that we will engage in acts of sexual violence"). So while the experts testified that paraphilic disorder is a "mental condition," that, *alone*, is insufficient to prove the "substantially probable" element of an SVP petition.

¶ 74        Unfortunately for respondent, the State's experts did make the connection between his mental disorders and his probability of reoffending. When asked "Is he dangerous because these mental disorders make it substantially probable he will engage in future acts of sexual violence?" Dr. Schechter responded "Yes." As for Dr. Smith, he did not make this connection directly. Instead, he testified:

"MR. GLENN [(ASSISTANT ATTORNEY GENERAL)]: Doctor, do you have an opinion, to a reasonable degree of psychological certainty, based upon your review of the records, use of risk assessment tools, based upon your education, training, and experience as to the Respondent's risk of reoffending?

DR. SMITH: Yes.

Q. And what is it?

A. That he's substantially probable to reoffend.

Q. And what does that mean?

A. Much more likely than not.

* * *

Q. Is he dangerous because he suffers from a mental disorder that is congenital or acquired?

A. Yes.

Q. What mental disorder?

A. Other specified paraphilic disorder, nonconsenting females with sadistic features in a control [*sic*] environment, alcohol, cannabis, and cocaine use disorders in a controlled environment and antisocial personality disorder.

Q. And do these mental disorders affect his emotional or volitional capacity and predispose him to make continued acts of sexual violence?

A. Yes."

¶ 75        While certainly not as direct as Dr. Schechter's testimony, Dr. Smith identified that respondent was "substantially probable" to reoffend and tried to bridge the connection between this risk and his mental disorders. Although counsel asked whether respondent was "dangerous" because of his mental disorder, it seems clear enough that by "dangerous" he meant a risk to reoffend based on his mental disorder.

¶ 76        It is the province of the trier of fact to draw reasonable inferences from witness testimony. *In re Detention of Welsh*, 393 Ill. App. 3d 431, 455 (2009). We do not require any specific, precise, or exact testimony to find that an expert sufficiently made the connection between respondent's mental condition and risk of reoffense. See *Gavin II*, 2019 IL App (1st) 180881, ¶ 50 ("When reading the experts' conclusions in their proper context, we find the record shows their determinations about Gavin's likelihood to reoffend eminently linked to their conclusions

that he had a mental disorder."). Here, the trial court reasonably concluded that Dr. Smith was connecting the dots between respondent's risk of reoffending and his mental disorders.

¶ 77   Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have determined that the State proved respondent was an SVP beyond a reasonable doubt.

¶ 78                                                              II

¶ 79   Respondent next complains that the trial court improperly considered the basis of the experts' testimony for its truth, as substantive evidence. While he concedes that the court could consider the underlying facts of respondent's sexually violent history for the limited purpose of evaluating the overall credibility of the experts' opinions, respondent says the trial court went further and adopted those facts as true and relied on them for its ruling.

¶ 80   We review evidentiary errors for an abuse of discretion. *Gavin I*, 2014 IL App (1st) 122918, ¶ 67. A circuit court abuses its discretion if its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Seymour v. Collins*, 2015 IL 118432, ¶ 50; see *Highmark Inc. v. Allcare Health Management Systems, Inc.*, 572 U.S. 559, 563 (2014).

¶ 81                                                             A

¶ 82   Before addressing the merits, the State claims respondent forfeited the argument by failing to raise a contemporaneous objection at trial and in a posttrial motion. Our supreme court has held "that a defendant need not interrupt a trial court to correct a trial court's misapprehension, after defense counsel has just argued the same to the court." *People v. Mitchell*, 152 Ill. 2d 274, 324-25 (1992); see *People v. Saldivar*, 113 Ill. 2d 256, 266 (1986).

¶ 83   In *Saldivar*, the defendant argued on appeal that the trial court improperly considered the wrong factors in aggravation of his sentence. *Saldivar*, 113 Ill. 2d at 266. During closing arguments, defense counsel "briefly" discussed using homicide as an aggravating factor—the claimed error. *Id.* Although the State argued that defendant waived the argument on appeal, our supreme court "[did] not believe this is a proper case for the application of the waiver rule." *Id.* "To preserve any error of the court made at that time, it was not necessary for counsel to interrupt the judge and point out that he was considering wrong factors in aggravation, especially in light of the argument that had preceded the ruling." *Id.*

¶ 84   Relying on *Saldivar*, the court in *Mitchell* reached a similar conclusion. There, the State argued the defendant waived review of his claim that the trial court failed to accurately recall testimony "because defense counsel failed to bring the inaccuracy to the court's attention." *Mitchell*, 152 Ill. 2d at 324. But during closing argument, defense counsel argued that defendant's testimony at the suppression hearing showed he was not free to leave and warranted the suppression of his confession. *Id.* at 325. Our supreme court acknowledged that defendant's testimony, if true, would show that a reasonable person was not free to leave. *Id.* at 322. However, in recalling the testimony, and refusing to suppress the confession, the trial court explained that it found "no testimony whatsoever that defendant felt he was not free to leave." *Id.* at 323-24. Because counsel made a specific point of arguing the evidence in favor of suppression, the court did "not believe under these circumstances that defendant has waived this issue for review." *Id.* at 325.

¶ 85    We likewise believe that a finding of forfeiture here is inappropriate. For one thing, it would be unreasonable to expect counsel to interrupt the trial court during its explanation of its decision. That is true for several reasons. One is the general respect that lawyers typically show the trial court while the court is speaking, respect that judges rightfully demand and encourage.

¶ 86    But another reason is that, until the trial court had finished speaking, respondent's counsel could not know what the trial court would or would not say next. Yes, the trial court discussed the facts underlying the experts' conclusion, but for all counsel knew, the next sentence out of the trial court's mouth might have been a recognition that the court could not consider the facts for their truth.

¶ 87    At what point in time, precisely, was counsel supposed to object? It is not as if the trial court stated, explicitly, that it was taking the facts considered by the experts for their truth. Rather, the trial court's discussion of the facts, for all respondent's counsel knew, could have been nothing more than a discussion of the propriety of the different pieces of evidence the experts considered, with a follow-up soon to come of the court acknowledging that it could not consider those facts for their truth. It is easy to say in hindsight that counsel should have objected at this point or that point. But respondent's counsel could not have fully appreciated whether the trial court was considering the underlying facts of the case as true until the trial court stopped talking, its decision having been announced.

¶ 88    And at that point, of course, the case was over. Counsel could have objected at that point, but that would have been nothing more than what counsel ultimately did by filing a posttrial motion. And we flatly reject the State's claim that respondent failed to raise this objection in the posttrial motion. He clearly did. As we noted above, his posttrial motion argued "[t]hat during the trial court's ruling, it erred in: *** accepting Dr. Schechter's and Dr. Smith's basis-of-opinion testimony as factual truth of which they had firsthand knowledge."

¶ 89    Under these circumstances, it would be terribly unfair to deny respondent his day in court on this appellate argument. We find no forfeiture.

¶ 90                                    B

¶ 91    That gets us to the merits of the argument. Again, respondent claims that the trial court accepted as true the information concerning respondent's sexually violent history on which the State's experts relied for their conclusions that respondent was an SVP.

¶ 92    Experts may rely on hearsay or other inadmissible evidence as long as experts in that field would reasonably rely on such information to reach their conclusions. *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51; *People v. Lovejoy*, 235 Ill. 2d 97, 142 (2009); see Ill. R. Evid. 703 (eff. Jan. 1, 2011) ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."). And the factfinder may consider those inadmissible underlying facts for the "limited purpose" of "deciding what weight, if any, [to] give the [expert's] opinions." Illinois Pattern Jury Instructions, Civil, No. 2.04 (2008) (hereinafter IPI Civil (2008) No. 2.04).

¶ 93    We say the "limited purpose" because the factfinder may *not* consider the underlying facts and data for their truth. *People v. Williams*, 238 Ill. 2d 125, 143 (2010); *Lovejoy*, 235 Ill. 2d at 145; see IPI Civil (2008) No. 2.04 (expert-basis testimony "is not evidence in this case and may not be considered by you as evidence"). In other words, we ask the factfinder, in

- 15 -

determining the credibility of the expert, to evaluate (among other things) the underlying facts on which the expert relied. But the factfinder is not permitted to accept those facts as true. *Williams*, 238 Ill. 2d at 143; *Gavin I*, 2014 IL App (1st) 122918, ¶¶ 68, 73 (facts underlying expert's testimony "can only be used by the jury to assess the weight of the experts' opinions, and not for the truth of the matter asserted").

¶ 94 One can imagine instances where it is easy to see the distinction between evaluating the expert's basis evidence merely to determine how much to credit the expert opinion, on the one hand, and determining the truth of those underlying facts, on the other. For example, a factfinder might be more likely to credit an expert who relied on the sworn trial testimony of John Doe over one who relied on a post by John Doe on his Facebook page—not because the information in either instance is necessarily true or false but because the first source seems more generally reliable than the second, and thus the first expert seems more careful or impartial than the second. Or the factfinder might credit an expert who relied on a treatise that has been universally accepted in the industry compared to another expert's reliance on a treatise that has been met with considerable controversy—again, not because one treatise's information is necessarily true or better but because the first expert seems to be conducting a safer, more conservative analysis.

¶ 95 But we are kidding ourselves if we think this distinction is anything but extremely subtle and exceedingly difficult, in practice, to apply. It is nearly impossible, in most instances, for a factfinder to determine the reliability of underlying facts without also determining whether those underlying facts are true. And if the factfinder determines that the underlying facts are true, it is even harder to imagine how that factfinder can wall off that finding. This is not an original thought:

> " '[T]he jury is told not to consider the otherwise inadmissible basis testimony for its truth. *** [T]his limiting instruction is even more troubling than most. It asks of juries something that is not just practically difficult, but logically incoherent. *** [Because] expert basis testimony is only relevant—even for the limited purpose of evaluating the expert's testimony—if it turns out to be true. If the expert's basis is false, any conclusions reached on that basis are unsubstantiated and unhelpful. To admit basis testimony for the nonhearsay purpose of jury evaluation of the experts is therefore to ignore the reality that jury evaluation of the expert requires a direct assessment of the truth of the expert's basis. Having invited the jury to make such an assessment, is it either fair or practical then to ask the jury to turn around and ignore it?' " *Gavin I*, 2014 IL App (1st) 122918, ¶ 78 (quoting David H. Kaye *et al*., The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.7.2 (2d ed. 2010)).

¶ 96 If this mental demarcation seems hard for a factfinder to apply, it is harder still for an appellate court to enforce on review. How can we tell when a factfinder has crossed the impermissible line from (1) finding the underlying factual basis sufficiently reliable to credit the expert's opinion testimony to (2) finding that those underlying facts, never admitted into evidence (and perhaps incapable of admission), are *true*?

¶ 97 It is a difficult task when the factfinder is a jury, which never explains the reasons for its verdict (the occasional special interrogatory aside). In those cases, the best we can do is draw inferences from the arguments made to the jury by the parties in closing argument. Compare *Gavin I*, 2014 IL App (1st) 122918, ¶¶ 73-74 (State impermissibly presented underlying basis evidence and thus invited jury to consider that information for its truth), with *In re Commitment*

*of Butler*, 2013 IL App (1st) 113606, ¶¶ 32-34 (State properly emphasized to jury that basis evidence was relevant only to considering reliability of expert testimony overall).

¶ 98       Here, however, because the case was tried to the bench, our task is simpler. For one thing, we begin with the presumption that the trial court considered the evidence only for its proper, limited purpose. *People v. Bailey*, 374 Ill. App. 3d 1008, 1023 (2007). That presumption may be rebutted only by "an affirmative showing to the contrary from the record on appeal." *People v. Avery*, 227 Ill. App. 3d 382, 389 (1992). And for another, the trial court meticulously explained its reasoning. We do not have to guess what the factfinder was thinking based on the arguments presented by the State; we have a transcript.

¶ 99       And on at least one occasion during the trial, the trial court addressed this very issue. After the State presented the testimony of its two expert doctors, the State sought to admit into evidence the doctors' reports. Respondent's counsel objected on hearsay grounds, arguing that "[t]here could be information in that report that she didn't testify to that I would have no ability to cross-examine about if it were admitted to the Court and the Court reviewed and used it for a finding." The trial court, wanting to make it "very, very clear," advised the parties that, while the reports could be admitted into evidence, "[t]hey will not be used or read by this Court as substantive evidence. [T]his Court will base its finding exclusively and only on the trial testimony that was heard under oath subject to cross-examination." The trial court understood that the experts' trial testimony, not the underlying bases of that testimony, was the only evidence that could properly be considered for its truth.

¶ 100      Nevertheless, respondent identifies two passages of the trial court's final ruling, both of which occurred during its discussion of Dr. Schechter's testimony. The trial court was most impressed with two pieces of underlying evidence. The first underlying fact was a statement attributed to respondent, in which he allegedly recounted the 1987 Illinois rape/murder to his friends this way: "I f*** her. I killed her. I f*** her again." The second underlying fact was the similarity between the 1987 Illinois crime and the later California one, in that each involved the use of duct tape to subdue the victims or would-be victims.

¶ 101      As to the first of these, the statement attributed to respondent, the court repeated it several times in announcing its decision, including this:

> "In [the Illinois] case, Dr. Schechter testified, and under cross-examination as well, *I find extremely credible* that Mr. Montanez brought the victim to his apartment, that he sexually assaulted her, strangled her to death, sexually assaulted her again, and that the *Respondent was quoted by a friend as stating, I f*** her. I killed her, and then I f*** her again*." (Emphases added.)

¶ 102      The court then went on to compare the 1987 Illinois case with the California crime, noting the use of duct tape in each case. The court noted again Dr. Schechter's testimony concerning the Illinois crime, in which respondent

> "showed friends where the victim's body was buried. And that when the body of the victim was exhumed aside from putting her in the attic after a few days and then taking her down into the basement, digging a hole and covering her with cement, when that body was exhumed *the victim was found to be restrained with duct tape*.
>
> *This was particularly significant because duct tape was also used by Montanez in the California case in 1992* where he was charged with false imprisonment, battery and assault with a deadly weapon. That Dr. Schechter indicated that and there was extensive

- 17 -

cross-examination regarding the doctor's findings, specifically regarding the aggravated criminal sexual assault and in my, this Court's opinion in assessing her credibility that she did find that these crimes or the crimes including the California case, and I will address that in a moment, were sexually motivated *particularly indicating, I f\*\*\* her. I killed her. I f\*\*\* her again, in the California case* in *particular where the Respondent used duct tape in order to restrain one of the victims in this matter to the point of using that duct tape around her face that her nose was broken, her hands were bound as well, and I would base that on the testimony that Dr. Schechter reviewed and testified to*, and that she did find, Dr. Schechter, that Respondent did meet the criteria." (Emphases added.)

¶ 103    Respondent claims that these passages show that the trial court considered the basis testimony for its truth, thus allowing the experts to impermissibly serve as "mere conduits for hearsay." *Williams v. Illinois*, 567 U.S. 50, 80 (2012). The trial court, says respondent, adopted the underlying facts as gospel—as "extremely credible"—and thus crossed the line from considering the underlying evidence as to the expert's credibility into the impermissible consideration of this basis testimony for its truth.

¶ 104    But we consider the trial court's comments in the context of its entire resolution of the matter. And in many instances while announcing its judgment, the trial court made it clear that it understood the limited use of the basis testimony. The trial court opened its comments by stating, "I want to make it very clear that my findings are based on the doctors." In the portion we quoted above, while discussing the connection between the Illinois and California crimes, the trial court noted that it was considering this testimony "in assessing [Dr. Schechter's] credibility."

¶ 105    In discussing Dr. Smith, who considered many of the same things as Dr. Schechter, the court noted that it "found Dr. Smith's testimony \*\*\* to be credible." The court noted, as to both State experts, that "they gave through their testimony specific reasons and factors that were subject to cross-examination that brought them to that conclusion" that respondent was an SVP.

¶ 106    And as to Dr. Kane, the trial court found that Dr. Kane's testimony was subject to diminished credibility because she relied in part on her interview with respondent, despite admitting herself that respondent's word could not be trusted—that he was an "unreliable historian." As discussed below, respondent argues that the trial court took that admission from Dr. Kane out of context, but that is not the point here. The salient point here is that the trial court was considering that basis testimony precisely how it is supposed to be considered—not for its truth but in determining whether the expert was credible in relying on it in the first place.

¶ 107    And finally, the trial court itself, in denying respondent's posttrial motion, likewise at least somewhat touched on this topic when it noted that it had

"ruled that if Dr. Schechter and the other—the doctor's [*sic*] relied upon—and pursuant to Illinois the state pursuant to the SVP Act, which specifically allows for that. That if the doctor's [*sic*] relied on those records in forming their opinions, then those records that the doctor's [*sic*] reviewed to form the basis of their opinions are admissible and subject to cross. And I made such ruling specific with that in mind."

¶ 108    In sum, the record does not affirmatively show that the trial court considered the expert-basis evidence for its truth. There is sufficient indication in the trial court's overall comments to demonstrate that the trial court was considering the facts and circumstances of respondent's

history in the context of having been relied upon and supporting the expert's opinions. See *Butler*, 2013 IL App (1st) 113606, ¶ 34 (though prosecutors discussed respondent's sexually violent history in narrative form in closing argument, prosecutors often referenced the reasonableness of experts in relying on that information, suggesting jury was not being asked to consider truth of those comments).

¶ 109                                                                III

¶ 110       Finally, and as previewed above, respondent complains that the trial court failed to accurately recall the attempted impeachment of Dr. Kane and that this failure led the trial court to improperly reject Dr. Kane's testimony in its entirety.

¶ 111       The trial court's failure to accurately recall testimony denies a defendant his or her due process right to a fair trial. *Mitchell*, 152 Ill. 2d at 322-23; also *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75 ("Our supreme court has held that the failure of the trial court to recall and consider evidence that is crucial to a criminal defendant's defense is a denial of the defendant's due process."). We will find a violation of due process only where the record "affirmatively shows" that the court did not accurately recall the testimony. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91.

¶ 112       In rendering its judgment, the court focused on Dr. Kane's statement that "I am not disputing that he is an unreliable historian." During her examination, Dr. Kane testified that there was too little information about what happened during the Illinois crime. Specifically, there was very little evidence that respondent committed a sexual assault during the Illinois murder, notwithstanding the fact that he pleaded guilty to that crime. (Respondent's central theme as to that plea of guilty to sexual assault in the Illinois crime was that respondent was trying to avoid the death penalty by pleading guilty to the murder, and the plea to criminal sexual assault was motivated by the same thinking.)

¶ 113       Specifically, Dr. Kane noted that respondent had repeatedly insisted that the sex was consensual. Without evidence to the contrary (because the victim and sole witness was murdered), she was unable to draw a strong conclusion about the facts of what happened. On cross-examination, the State attempted to impeach her on this point:

"Q. Do you believe his statement of that offense?

A. Which statement?

Q. The statement that it was consensual.

A. I don't know. There is no evidence to suggest that it wasn't consensual, that the actual sex act wasn't consensual.

Q. Doctor, you were deposed in this case; is that correct?

A. Yes.

Q. Isn't it true that you characterized the respondent as an unreliable historian?

                                    * * *

Q. Would you characterize your answer as finding him as an unreliable historian?

A. Yes.

Q. 'Do you believe his narrative? Answer. No.'

A. Right. I'm not disputing that he is an unreliable historian."

¶ 114    On redirect, respondent's counsel focused in on the fact that the question, "Do you believe his narrative" and the answer, "No," were actually in response to questions about respondent's recollection of the California events, *not* the Illinois murder.

¶ 115    In respondent's view, the court used the deposition testimony about *California* to discredit Kane's conclusions about the *Illinois* crime. But the court did not focus on the isolated question from Dr. Kane's deposition. Instead, it relied on Dr. Kane's in-court, *general* statement that "I'm not disputing that he is an unreliable historian." Unlike the deposition statement, Dr. Kane's in court testimony was not isolated to the California narrative.

¶ 116    We have no basis for finding reversible error on this point.

¶ 117                                          IV

¶ 118    Though we affirm the judgment below in its entirety, we must comment on the lack of an adequate record on appeal. We have virtually no record. We have the experts' written reports and the transcript of proceedings, which consisted entirely of expert testimony and counsel's argument. We are told that each expert reviewed a "master file" consisting (apparently) of all police, court, and DOC records. That seems to be the common practice in these SVP cases, consisting of nothing more than the testimony of experts who rely on these "master files." See *Gavin I*, 2014 IL App (1st) 122918, ¶ 4; *Hooker*, 2012 IL App (2d) 101007, ¶ 63 (commenting that review of "master file" appears to be common, accepted practice in SVP evaluations). But we do not have that master file, as it was never introduced into evidence.

¶ 119    We understand, as discussed above, that experts may rely on inadmissible evidence and that expert-basis evidence need not be admitted into evidence. And we understand that there is particular concern about allowing a jury to view some of this basis evidence (not an issue here, of course, where no jury was present).

¶ 120    But this case involves a man's liberty. And not whether he should be deprived of that liberty to serve a prison sentence, but whether he should be confined *after* he served that sentence based on nothing more than experts' educated predictions on what he might do if set free in society. So it is imperative that a reviewing court have access to the information underlying those critically important expert opinions.

¶ 121    After all, "an expert's opinion is only as good as the independent evidence that establishes its underlying premises." *Williams*, 567 U.S. at 81. "[T]he opinion of an expert is only as valid as the reasons or basis underlying the opinion," and thus "a party must lay a sufficient foundation to establish the reliability of the reasons for the expert's opinion." *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 163. If the basis for the expert's opinion is so uncertain that it reaches the level of pure speculation, the expert's opinion should not even be admitted in the first place. *Id.* So it is imperative that the reviewing court be presented not only with the experts' reports and opinions but also with the information on which they base their opinions—not for their truth but to determine whether the experts are basing their conclusions on reliable sources of information.

¶ 122    The "master file" on which each expert relied presumably contains any number of documents—internal memoranda, police reports, witness statements, affidavits, sworn trial testimony, court orders and opinions, and a number of different DOC documents—and not all of these documents are created equal in terms of reliability. To pick just one example, police reports are generally deemed inadmissible hearsay. *Palacios v. Mlot*, 2013 IL App (1st)

121416, ¶ 37; *Rodriguez v. Frankie's Beef/Pasta & Catering*, 2012 IL App (1st) 113155, ¶ 14. Unless it falls within an exception, hearsay is inadmissible " ' "due to its lack of reliability." ' " *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶ 70 (quoting *People v. Caffey*, 205 Ill. 2d 52, 88 (2001), quoting *People v. Olinger*, 176 Ill. 2d 326, 357 (1997)).

¶ 123    So while an expert is not prohibited from relying on an inadmissible police report, it is critical that the trier of fact (and the reviewing court, if necessary) scrutinize *not* the truth of that police report but *whether it is a reliable and credible source* on which the expert should rely. And quite obviously, not every police report is equally reliable; the context matters. For example, surely we would recognize the difference in reliability between a police report recounting an officer's first-hand observations of the suspect (one level of hearsay) versus another report in which the officer was told by friends of the suspect that the suspect admitted something to them about the crime (three levels of hearsay, with perhaps the final level being an exception to the hearsay rule).

¶ 124    Our lack of a record prevented us from reviewing the sources of the two critical pieces of information on which the trial court heavily relied in assessing the credibility of the State's experts' testimony: (1) evidence that both the California and Illinois crimes involved the use of duct tape and (2) respondent's infamous comment to his friends, discussing the Illinois crime and what he did to the victim: "I f*** her. I killed her. I f*** her again."

¶ 125    To be fair, respondent did not claim on appeal that the sources of this information were *not* reliable. (And for good reason, as we will explain below.) This is not a complaint respondent is raising; this complaint is our own.

¶ 126    Though respondent did not raise this specific issue, he *did* challenge the sufficiency of the evidence on different grounds. He also claimed various trial errors that might have required us to review the overall strength of the State's case to determine whether any such error was harmless. We found no such error, but had we done so, our ability to review the overall strength of the evidence would have been impeded because we would have had no idea of the source of the information on which the experts and trial court heavily relied—and thus we would have had no ability to evaluate the credibility of those experts' testimony.

¶ 127    For example, respondent's infamous statement about postmortem sex with the Illinois victim. In their trial testimony, specifically on cross-examination, the State's experts testified that their knowledge of this statement came from a "Case Fact Sheet" (Dr. Schechter) or an "Official Statement of Facts" (Dr. Smith). Neither expert, when pressed, knew what those documents were or who drafted them. And neither of those documents are contained in the record on appeal. So we have no idea whether those documents are from first-hand knowledge, fourth-hand knowledge—we have no idea how many levels of hearsay they contain, much less who even wrote those reports. We have no idea, based solely on this record, whether that piece of basis evidence was even remotely reliable.

¶ 128    Given the stakes involved and the nearly exclusive role that experts play in these cases, we would strongly encourage the parties and the trial court in these SVP cases to include the "master file"—and anything else on which the experts rely—in the record on appeal. Without them, we are left with nothing but naked expert testimony, but not the information on which they relied. That information may ultimately be unnecessary to the resolution of the appeal, but it is far preferable to have a record and not need it than to need a record and not have it.

¶ 129    Having said all of this, and though it was ultimately unnecessary to our resolution of the issues on appeal, we should note that both pieces of expert-basis evidence—that duct tape was

used in both the Illinois and California crimes and that respondent admitted to postmortem sex with the Illinois victim—came from sworn testimony at respondent's abbreviated criminal trial. We know as much because we judicially notice our previous appellate decisions stemming from respondent's Illinois conviction, which provided that information from the trial record. See *People v. Montanez*, No 1-01-0807 (2003) (unpublished order under Illinois Supreme Court Rule 23); *People v. Montanez*, 2013 IL App (1st) 110168-U, ¶¶ 4-5; see also *Bank of America, N.A. v. Kulesza*, 2014 IL App (1st) 132075, ¶ 21 (appellate court may judicially notice previous appellate decisions); *Aurora Loan Services, LLC v. Kmiecik*, 2013 IL App (1st) 121700, ¶ 37 (same).

¶ 130     We would prefer to have learned this information from the record on appeal than to resort to matters beyond the record, even though readily capable of judicial notice. We thus strongly encourage the State to put these "master files" into the record, even if the trial court shields some or all of it from the jury's eyes. (And if not the State, then respondent, who has the burden on appeal of providing a sufficient record to support his or her arguments.)

¶ 131     That recommendation aside, we have no basis to reverse the trial court's judgment. We thus affirm it.

¶ 132                                 CONCLUSION

¶ 133     The judgment of the trial court is affirmed.

¶ 134     Affirmed.